OPINION OF THE COURT
Bentley Kassal, J.
issue
May changes solely in the child and his interaction with the parents constitute sufficiently "material changes in circumstances” to warrant a change in custody, assuming that the objective characteristics of the parents have remained relatively constant since custody was awarded?
This is the issue raised by the father’s application to modify a judgment of divorce, dated May 26, 1971, to award him custody of the only child, a 15-year-old boy.
THE SON
The son suffered minimal brain dysfunction, apparently from a birth injury, which resulted in some neurological impairment and learning disabilities, affecting eye-hand coordination and fine and gross motor controls. Although chronologically 15 years old, psychiatric testimony concluded that his maturation level was equivalent to a 13-year-old. He is very short for his age (4 feet 7 inches) and overweight (115 pounds), although his weight problem apparently stems from emotional problems, not having any direct glandular or physi *553 cal basis. Since an early age he has attended special educational programs and the last four years has been at a special school in Flushing for children with learning problems.
Except for the above characteristics, the boy is essentially normal, with no speech problem and able to participate in most sports.
Basically, the testimony from the lay witnesses related to the son’s personal hygiene, appearance and school performance. This credible and disinterested testimony clearly showed that he has serious problems in regard to his personal hygiene and habits — his clothes are invariably soiled and dirty, his face, hands, nails and hair are filthy and he has very noticeable foul body odors from not bathing. In other respects, he is generally disorganized and often not prepared for school, arriving at class without books or pencils and not having done his assignments. In sharp contrast to this usual manner, there was substantial evidence that the son’s person, hygiene, appearance and general preparedness greatly improved when he went to school directly after an overnight visitation with his father. His 15-year-old camp bunkmate testified very impressively that when peer group pressure was asserted, his cleanliness and personal habits improved.
court’s interview with the son
With consent, two hours were spent in camera, alone with the son. He was advised that the record was for court purposes only and would be sealed, except on appeal.
He confirmed much of the testimony about his personal characteristics and the continuing unpleasantnesses, difficulties and struggles with his mother, including, unfortunately, the exchange of physical blows, on occasion. Not having met him before except indirectly through testimony by others, he made a deep impression with his unexpected maturity and intelligence in evaluating the entire situation and in appreciating that, although he had had disagreements with his father, they could discuss, reason and talk matters out, without the necessity for physical punishment or disagreeable encounter.
He did comprehend the need for discipline and organization in his personal, school and work habits, and when suggestions in these areas emanated from his teachers, camp bunkmates and father, he had taken constructive action. By contrast, *554 suggestions from his mother so turned him off that he completely ignored them.
When confronted with direct questions as to his views about his future, which parent would be better suited to have custody at this point and what "brainwashing” or influences have been used in terms of this proceeding, his answers were perceptive and unequivocal, as were his views about their lifestyles and their impact upon his personal habits, hygiene, work discipline and general peace of mind.
He demonstrated a clear and deep insight as to his emotional reactions to his parents and, especially, their parental advice and guidance. As an example — as to his mother’s threats to him to leave the city if she did not retain custody (which she admitted having said to him on more than one occasion), his answer was wise: if she disliked me so much that she would want to move, that would show she did not love me at all.
The session was a most rewarding and telling experience for a Judge and through it all the subliminal need, at this stage in his life, for greater male identification and companionship was evident.
THE MOTHER
The mother, age 52, exhibits a great affection, concern and interest in her son and has dealt with his special problems to the best of her capability since she first became aware of them. She took special education classes and participated in various programs in which her son was involved.
The mother’s emotions, lack of control and mannerisms, however, make her less than able to deal with her son’s problems. Several witnesses testified that she is a bit hysterical and her mannerisms are jumpy, nervous and unpredictable. The court observed these mannerisms throughout the trial to the degree that they were most distracting. In fact, she conceded she was by nature an "interrupter”, "volatile” and "tends to speak in hyperbole”. After one outburst in court, the mother stated, "I am not particularly a disciplined person”.
The court is impressed by the remarkably similar descriptions of the mother’s behavior in group sessions with the father and son, as testified to by both psychiatric experts. Both found her to be unco-operative, highly emotional, argumenta *555 tive, tangential, provocative and observed that she shouted at all the other participants.
In general, it appears she is almost unable to control her emotional responses. Even when one of the psychiatrists suggested to her that it might not be in her best interest to be argumentative and to talk about people plotting against her, she seemed driven to continue. This very same phenomenon was observed by the court when she was advised that her continued gesticulations and interruptions during trial might reflect poorly on her cause. This lack of control also evidenced itself during the period of the trial when she disclosed to her son the testimony of other witnesses, such as her son’s camp-mate and present teachers, after the court had given clear instructions not to do so since it might cause him emotional damage.
On two occasions during the course of the proceedings while the mother had physical custody of her son, she failed to produce him as directed. On one occasion, when the son was to be produced in court, the mother claimed that he was ill and that she had left him with the doctor, which the doctor subsequently testified was not necessary. On a second occasion, when he was due for an interview with the impartial psychiatrist, the mother appeared, stating that the son did not want to come. Whether this resulted from the actions of the mother or boy, it reflects her inability to properly supervise and control him. Finally, the mother conceded that on at least two occasions, she had threatened her son that if she lost custody, she would either move to Mexico or commit suicide. This she played down in court as obviously not being serious threats.
THE FATHER
The father, age 59, has been very active in organizations dealing with learning-disabled children, the parents’ association at his son’s school, and other programs in which his son was involved. He takes a great interest in his son’s education and appearance and assisted his son in overcoming his neurological problems to become Bar Mitzvahed. He has even had some success in helping his son with his weight problems.
In sharp contrast to the mother, the father is calm, logical and organized in his behavior and although he has had some psychological therapy, his therapist testified he has no deep psychological problems. However, there is some psychiatric *556 evidence that the father may be somewhat overprotective of the son and over-identifies with him to a degree, with the conclusion that this did not reach an inordinate or detrimental level.
Due to the liberal visitation, the father has spent a great deal of time with his son since the divorce and, in addition to normal visitation, he has often visited the son at school, Hebrew school and, at other times, on "neutral turf’. In fact, a great deal of friction between parents has been caused by the father’s attempts to see or communicate with his son, other than for scheduled visitation.
Both parents love their son very much. The mother feels that the father "interferes” too much, he is "intrusive” and his contact with the son should be strictly limited to the visitation periods provided in the divorce decree. The father, on the other hand, claims that the mother interferes with his ability to see his son and listens in on telephone conversations he has with the son, during which she either interrupts the conversations directly or shouts at the son while he is talking on the phone.
PSYCHIATRIC TESTIMONY
The psychiatric experts testified to the son’s need at this time for a strong male role figure to relate to, which need is heightened by the problems of his physical appearance, delayed maturation and somewhat weakened male sexual identification. Without exception, the psychiatric and educational experts recommended that a boy with these problems should live in a structured environment, with proper discipline and consistent behavior by his parents.
Both psychiatric experts testified to his desire to live with his father and agreed the son’s decision was correct and supported by significant factors and reason.
The impartial psychiatrist, who interviewed both parents and the boy, recommended that, at this stage in his development, the father should have custody. This psychiatrist, with extensive court experience in custody proceedings concluded that the boy’s present relationship to his two parents and, especially, his very special needs in regard to a custodial parent dictated a custodial change now.
GENERAL POLICY CONSIDERATIONS
"Custody should be established on a long term basis *557 whenever possible * * * and changes in established custody made only on the demonstration of a sufficient change in circumstances to show a real need to effect a change to insure the welfare of the child”. (Matter of Rodolfo "CC" v Susan "CC", 37 AD2d 657; see, also, Matter of Ebert v Ebert, 38 NY2d 700, 703; Obey v Degling, 37 NY2d 768, 770; Dintruff v McGreevy, 34 NY2d 887, 888; Matter of Lang v Lang, 9 AD2d 401, 409, affd 7 NY2d 1029.) Nor should custody be shuttled back and forth between parents on the basis of improvements in their psychological adjustment or other circumstances. (Matter of Lang v Lang, supra.) Finally, since a child’s desires and affections change throughout his development resulting in periodic reorientations toward one or another parent, the desire of the child cannot be determinative. (Dintruff v McGreevy, supra, p 888.)
In spite of the above general policy considerations, the court cannot ignore the fact that both children and parents change and develop and, most importantly, the needs of a child, in objective terms, may change radically over a period of time. Thus, while one parent may be fit and proper custodian for a child at the time of a divorce, changes in the needs of the child himself, and in his ability to interact with that parent, may require a reappraisal and re-evaluation in order to guarantee that the welfare and advancement of the child is protected.
CONCLUSIONS
Both parents, in their individual way, love and are sincerely interested in their child’s welfare. Although the mother has been doing her best, she has been unable, because of her own problems, disorganization and lack of effective disciplining, to deal with the critical specialized problems concerning the son’s upbringing and crying need for training.
She has no effective control over the boy and, indeed, he has rebelled against her on numerous occasions, solely because of extreme personality conflicts. It appears that she may have occasionally used the boy’s custody as a pawn and weapon in her continuing struggle against her exhusband.
The boy is a bright adolescent with many problems that appear capable of being eased by proper direction and discipline. His mother has been unable to provide this and his father does have a history of some success with him along *558 these lines. He does indeed provide the male figure which is so urgently needed and yearned for in the son’s life at this juncture.
By his own words, the son is more relaxed, calm and peaceful with his father and completely unable to cope with the frantic, hectic life of his mother. This has been manifested too frequently and it is obvious that he appreciates his father’s approach in reasoning with him whereas his mother has given him orders, resulting in his irritation and counteraction.
The court’s decision is no determination, in the usual sense, that the mother is not a fit mother. Rather it is a decision that, in view of his special needs, the child’s best interests overwhelmingly mandate that while there is a fair chance of helping mold and prepare him for maturity and responsibility —which has not been accomplished to a satisfactory extent to date by the mother — the father, with the resources to do so, should be given an opportunity to help straighten the boy out.
The application of the father for custody is granted. Settle order, including provision for visitation. The attorneys should attempt to stipulate visitation.