MICHAEL PETRILLO *et al.*, Plaintiffs-Appellees, v. SYNTEX LABORATORIES, INC., *et al.*, Defendants (Thomas F. Tobin, Contemnor-Appellant).

First District (4th Division)   No. 85—604

Opinion filed June 26, 1986.—Rehearing denied November 6, 1986.

582

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas R. Nelson, J. Kent Mathewson, Michael A. Pollard, and Richard B. Foster III, of counsel), for appellant.

Hayes & Power and Sidney Z. Karasik, both of Chicago (John D. Hayes, of counsel), for appellees.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Thomas F. Tobin, a defense attorney for Syntex Laboratories, Inc. (Syntex), brings this appeal challenging the propriety of a trial court's order finding him in contempt of court. The contempt citation was issued in connection with a product liability action instituted by several plaintiffs against Syntex. Tobin was found to be in contempt of court after he notified the trial court that he would not comply with the court's order barring him from engaging in private, ex parte[1] conferences with the plaintiffs' treating physicians.

On appeal, Tobin presents a multitude of arguments supporting his contention that the trial court's contempt citation should be reversed and vacated. These arguments, while numerous, are essentially based on two general theories: (1) a plaintiff, by filing suit and placing his mental and physical condition at issue, waives his physician-patient privilege and therefore cannot object to defense counsel engaging in ex parte conferences with his treating physicians; and (2) prohibiting defense counsel from engaging in ex parte conferences with a plaintiff's treating physician violates defense counsel's first amendment freedom of speech rights.

We affirm the order of the trial court.

BACKGROUND

During 1978 and 1979, Syntex produced and distributed two in-

---

[1]"Ex parte" as used throughout this opinion includes any discussion that defense counsel has with a plaintiff's treating physician which is not pursuant to the authorized methods of discovery outlined by Supreme Court Rule 201 (87 Ill. 2d R. 201).

fant formulas named Neo-Mull-Soy and Cho-Free. In 1980, Michael Petrillo filed suit against Syntex alleging that he consumed Neo-Mull-Soy and was injured as a result. Soon thereafter, Petrillo's action was consolidated, for discovery purposes, with 25 other plaintiffs alleging similar injuries resulting from their ingestion of Syntex' formulas.

On May 18, 1984, while discovery in the consolidated action was taking place, Tobin informed the trial court that he had engaged in *ex parte* conferences with Dr. Lawrence Tomasi, one of Petrillo's treating physicians. Upon hearing this, the attorney representing the plaintiffs moved the trial court to bar Tobin, or any agent of Syntex, from engaging in any future *ex parte* conferences with any of the plaintiffs' (those 25 plaintiffs joined in the consolidated action) treating physicians. After a hearing on the matter, the trial court granted the motion finding that public policy bars such conferences.

On November 28, 1984, Tobin informed the trial court that he was going to engage in an *ex parte* conference with Dr. Green, a treating physician for one of the plaintiffs in the consolidated case. Although Tobin acknowledged that the *ex parte* conference would violate the trial court's May 18, 1984, order, he nevertheless contended that the trial court erred in barring him from engaging in *ex parte* conferences with the plaintiffs' treating physicians. Based on Tobin's aforementioned conduct, the trial court held Tobin in direct contempt of court. On December 28, 1984, the trial court fined Tobin the sum of $1.

Tobin now brings this appeal.

Opinion

Initially, we note that this is a case of first impression for an Illinois court of review. The Illinois Supreme Court has not yet addressed this issue nor is there any legislation directly on point.[2]

As noted above, Tobin's arguments urging reversal fall into two general categories: the waiver of the physician-patient privilege the-

---

[2]In his brief, Petrillo points out that the Illinois General Assembly passed an amendment to the physician-patient privilege statute (Ill. Rev. Stat. 1983, ch. 110, par. 8—802) in the form of House Bill 1269. That amendment reads:

"No disclosure shall be made in any action brought by or against the patient, his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate wherein [*sic*] the patients physical or mental condition is an issue, except in accord with methods of discovery expressly set forth in the Supreme Court Rules, and only after reasonable notice to the attorney of [*sic*] such action for the patient or [*sic*] his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate."

However, at this time, the Governor has not yet signed House Bill 1269 into law.

ory and the constitutional free speech theory.

Addressing first Tobin's argument regarding the waiver issue, Tobin contends that *ex parte* conferences between defense counsel and a plaintiff's treating physician should be permitted because: (1) no public policy exists which prohibits defense counsel from engaging in *ex parte* conferences with a plaintiff's treating physician; (2) prohibiting defense counsel from engaging in *ex parte* conferences with treating physicians would force Tobin to obtain the opinions of treating physicians through depositions, a costly and inefficient means of gathering information; (3) prohibiting *ex parte* conferences between defense counsel and a plaintiff's treating physician allows a plaintiff's attorney to "neutralize" experts such as Dr. Tomasi; (4) barring Tobin from engaging in *ex parte* conferences with a plaintiff's treating physician would allow "unscrupulous" plaintiffs to monitor the development of the defense's case and thereby obtain "enough information to extort unjustified nuisance settlements"; (5) *ex parte* conferences are not barred by the ethical standards imposed upon attorneys; (6) a plaintiff has no proprietary right to any person's testimony; (7) permitting *ex parte* discussions will help facilitate early evaluation and settlement of cases leading to a decrease in litigation costs and the conservation of judicial resources; (8) trial courts are empowered to take the necessary steps, such as the issuance of a protective order or the granting of a motion *in limine*, should any defense attorney abuse the *ex parte* conference; (9) *ex parte* conferences are not barred by the Supreme Court Rules or the applicable provisions of the Code of Civil Procedure; and (10) prohibiting *ex parte* conferences is tantamount to standing in the way of ascertaining the truth.

As a preliminary matter, Petrillo argues that our review should be limited to whether the trial court was correct in finding Tobin to be in violation of the court's order and that we need not address, in answering this inquiry, the propriety of the trial court's order itself.

In *People ex rel. Scott v. Silverstein* (1981), 87 Ill. 2d 167, 429 N.E.2d 483, the supreme court held that a contempt judgment including a fine or imprisonment "is a final and appealable judgment and presents to the court for review the propriety of the order claimed to have been violated." (87 Ill. 2d 167, 174, 429 N.E.2d 483.) In the present case, Tobin was found in contempt and fined. Thus, the correctness of the trial court's original order (which Tobin was found to have violated) is properly an issue before this court.

Before addressing the merits of each of Tobin's respective arguments, we believe it critically important to note that Tobin has failed, in both his brief and during oral argument, to identify a single piece

of information or evidence which he is able to obtain through an *ex parte* conference that he cannot obtain via the conventional methods of discovery outlined by Supreme Court Rule 201 (87 Ill. 2d R. 201 (oral depositions, depositions upon written questions, and discovery of documents)). In addition, a thorough review of case law from other jurisdictions reveals that *in not one instance* has a court found that *ex parte* conferences were necessary in order to permit defense counsel to obtain information that they were unable to obtain through the regular channels of discovery. Thus, it is undisputed that *ex parte* conferences yield no greater evidence, nor do they provide any additional information, than that which is already obtainable through the regular methods of discovery.

It is with this in mind that we now address the arguments raised by Tobin.

## I

Tobin first contends that there is no public policy prohibiting *ex parte* conferences. We strongly disagree.

■ Public policy is found in a State's constitution and statutes, and where those are silent, in the decision of the judiciary. (*Smith v. Board of Education* (1950), 405 Ill. 143, 89 N.E.2d 893.) An act can be against public policy even though it is not specifically prohibited by a State's statutes or constitution for a finding of public policy can often be inferred from these sources. (*Pittsburgh, Cincinnati, Chicago & St. Louis R.R. Co. v. Kinney* (1916), 95 Ohio St. 64, 115 N.E. 505.) The meaning of "public policy" is variable for there is no fixed rule to determine which acts are repugnant to it. (*Girard Trust Co. v. Schmitz* (1941), 129 N.J. Eq. 444, 20 A.2d 21.) Public policy has been defined as, "[T]hat principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good." (129 N.J. Eq. 444, 454-55, 20 A.2d 21, 29.) An act against public policy has also been described as that which " 'conflicts with the morals of the time, and contravenes any established interest of society.' " (*State ex rel. Smith v. Bowman* (1914), 184 Mo. App. 549, 553, 170 S.W. 700, 701.) Public policy, therefore, should forbid, even though such is not expressly prohibited by a State's statute or constitution, that conduct which tends to harm an established and beneficial interest of society the existence of which is necessary for the good of the public.

■ In the case at bar, we believe that modern public policy strongly favors the confidential and fiduciary relationship existing between a patient and his physician. We further believe that this public

policy arises from the fact that society possesses an established and beneficial interest in the sanctity of the physician-patient relationship. We find this public policy to be reflected in at least two separate indicia: (1) the promulgated code of ethics adopted by the medical profession and upon which the public relies to be faithfully executed so as to protect the confidential relationship existing between a patient and his physician; and (2) the fiduciary relationship, recognized by courts in Illinois as well as courts throughout the United States, which exists between a patient and his treating physician. Because public policy strongly favors both the confidential and fiduciary nature of the physician-patient relationship, it is thus axiomatic that conduct which threatens the sanctity of that relationship runs afoul of public policy. That being so, we believe, for the reasons set forth below, that *ex parte* conferences between defense counsel and a plaintiff's treating physician jeopardize the sanctity of the physician-patient relationship and, therefore, are prohibited as against public policy. Our determination that public policy prohibits such conferences is bolstered evermore by the fact that no appreciative gain (regarding the evidence to be obtained) can be had through such meetings. Accordingly, we join the growing number of courts which have found that public policy strongly favors the confidentiality of the physician-patient relationship and thereby prohibits, because of the threat posed to the sanctity of that relationship, extra-judicial, *ex parte* discussion of a patient's medical confidences. See, *e.g., Hammonds v. Aetna Casualty & Surety Co.* (N.D. Ohio 1965), 243 F. Supp. 793; *Horne v. Patton* (1973), 291 Ala. 701, 287 So. 2d 824; *Piller v. Kovarsky* (1984), 194 N.J. Super. 392, 476 A.2d 1279, 1281; *Doe v. Roe* (1977), 92 Misc. 2d 551, 400 N.Y.S.2d 668; *Humphers v. First Interstate Bank* (1984), 68 Or. App. 573, 684 P.2d 581, *aff'd in part, rev'd in part & remanded* (1985), 298 Or. 706, 696 P.2d 527.

The first indicia of a public policy prohibiting *ex parte* conferences is that found in the code of ethics which governs the conduct of the medical profession and upon which the public relies to be faithfully executed. The code of ethics for the medical profession is comprised of three separate "prongs": (1) the Hippocratic Oath; (2) The American Medical Association's (AMA) Principles of Medical Ethics; and (3) The Current Opinions of the Judicial Council of the AMA (1984 ed.). These three "prongs" underscore the highly confidential nature of the physician-patient relationship and, perhaps more importantly, affirmatively advertise to the public that a patient can properly expect his physician to protect those medical confidences which are disclosed during the physician-patient relationship.

According to the Judicial Council of the AMA, the Hippocratic Oath was first conceived during the fifth century B.C. It is the oldest statement of ethics governing the medical profession and demonstrates that the confidentiality of the physician-patient relationship is rooted deep in history. The oath states:

> "Whatever, in connection with my professional practice or not in connection with it, I see or hear, in the life of men, which ought not to be spoken abroad, I will not divulge, as reckoning that all such should be kept secret."

The AMA's Judicial Council explains: "The Oath of Hippocrates, a brief statement of principles, has come down through history as a living statement of ideals to be cherished by the physician." As a reading of the oath discloses, physicians have, *for several hundred years,* acknowledged their obligation of keeping in trust a patient's confidences.

The AMA's Principles of Medical Ethics is the second prong comprising the ethics of the medical profession. The current principles were adopted in 1977 and are eight in number. Principle II states in relevant part: "A physician shall deal honestly with his patients and colleagues ***." Principle IV states:

> "A physician shall respect the rights of patients, of colleagues, and of other health professionals, and shall safeguard patient confidences within the constraints of the law."

These principles are the ethical guidelines of the physician and dictate that the physician owes his patient an obligation of *honesty* as well as *confidentiality.*

The third prong of the rules comprising the ethics of the medical profession is found in the Current Opinions of the Judicial Council of the AMA. These opinions reflect the AMA's position on how a physician should act in particular circumstances. Section 5.05 of the Current Opinions, for example, states:

> "The information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree ***. The physician should not reveal confidential communications or information without the *express consent of the patient,* unless required to do so by law."
> (Emphasis added.)

Section 5.06 deals specifically with the attorney-physician relationship and again reiterates the requirement of patient consent:

> "The patient's history, diagnosis, treatment, and prognosis may be discussed with the patient's lawyer *with the consent of the patient* or the patient's lawful representative." (Emphasis

added.)

Moreover, sections 5.07 and 5.08 state:

"History, diagnosis, prognosis, and the like acquired during the physician-patient relationship may be disclosed to an insurance company representative only if the patient or his lawful representative *has consented* to the disclosure." (The American Medical Association, Current Opinions of the Judicial Council sec. 5.08.) (Emphasis added.)

Both the protection of confidentiality and the appropriate release of information in records is the rightful expectation of the patient. A physician should respect the patient's expectations of confidentiality concerning medical records that involve the patient's care and treatment." (The American Medical Association, Current Opinions of the Judicial Council sec. 5.07.)

A reading and comparison of the Hippocratic Oath, the AMA's Principles of Medical Ethics, and the Current Opinions of the AMA's Judicial Council reveals, without any question, the medical profession's obligation to keep communications divulged by a patient to his physician as confidential as possible. Indeed, the Hippocratic Oath speaks of "secrecy," the AMA's Principles of Medical Ethics requires a physician to "safeguard patient's confidences," and the AMA's Judicial Council mandates physicians to keep patient's discussions "confidential to the greatest degree possible." In addition to confidentiality, however, the ethics of the medical profession consistently require patient consent before confidential information is released. Indeed, according to the AMA's Judicial Council, prior consent is "the rightful expectation of the patient." The American Medical Association, Current Opinions of the Judicial Council sec. 5.07.

Thus, confidentiality and patient consent are inextricably tied together; the relationship between a patient and his physician remains confidential only as long as a patient can rest assured that he must give his consent before any of the information disclosed during the physician-patient relationship is released to third parties. Indeed, at the very minimum, the confidential relationship existing between a patient and physician demands that information confidential in nature remain, absent patient consent, undisclosed to third parties. If such were not the case, then no confidentiality between a patient and his physician in fact exists.

It is for this reason that *ex parte* conferences between defense counsel and a plaintiff's treating physician undermine the confidentiality of the physician-patient relationship. The physician, by engaging in such a conference, discusses the patient's confidences without the con-

sent of the patient. To this end, the physician divulges to a third party information which the patient originally disclosed to the physician with the belief that the information would remain confidential unless the patient gave his consent otherwise. Consequently, when a physician and defense counsel engage in an *ex parte* conference regarding the confidences of the patient (without the patient's consent), the confidentiality which once existed between the patient and his physician is completely disregarded and the sanctity of the relationship existing between a patient and his physician is thereby destroyed.

The consent that is necessary before a patient's confidences may be properly disclosed to third parties is, of course, twofold in nature. The consent can take the form of an express consent (*e.g.*, a written waiver) or it can be implied at law by the patient's conduct. In this regard, we note that when a patient files suit, he implicitly consents to his physician releasing any of the medical information related to the mental or physical condition which the patient has placed at issue in the lawsuit (see section IX below).

■■ The patient's implicit consent, however, is obviously and necessarily limited; he consents only to the release of his medical information (relative to the lawsuit) *pursuant to the methods of discovery authorized by Supreme Court Rule 201(a)* (87 Ill. 2d R. 201(a)). A patient certainly does not, by simply filing suit, consent to his physician discussing that patient's medical confidences with third parties outside court-authorized discovery methods, nor does he consent to his physician discussing the patient's confidences in an *ex parte* conference with the patient's legal adversary. Accord, *Fields v. McNamara* (Colo. 1975), 540 P.2d 327.

To the contrary, when a patient files suit, he consents only to the release of certain information; he does not automatically consent to the termination of the confidential relationship existing between him and his physician. In this respect, the confidential nature of the physician-patient relationship continues to exist even though the patient, by filing suit, has consented to the disclosure (through court-authorized discovery methods) of that information relevant to the condition placed at issue in the lawsuit. Therefore, because the confidential relationship between a patient and his physician remains intact, the physician continues to owe his patient an ethical obligation to release his patient's medical information pursuant only to that patient's consent. (See, The American Medical Association, Current Opinions of the Judicial Council secs. 5.05, 5.06, 5.08.) Consequently, because a patient's consent, upon filing suit, is limited, it is evident that any other type of disclosure by the physician would not have

the consent of the patient and would, therefore, be unethical. Thus, *ex parte* conferences damage the confidential nature of the physician-patient relationship by violating the patient's right to believe that his physician is faithfully executing that physician's ethical obligations.

■ Moreover, it is important to remember that the ethics of the medical profession constitute more than just a set of regulations affecting members of a particular profession; they also grant the public, specifically a patient seeking a physician's help, an *affirmative right* to rely on his physician to faithfully execute those ethical obligations. It is significant to note, in this respect, that the ethical guidelines set forth above exist only as a result of that which is generated by the person most intimately involved in the physician-patient relationship, namely, the patient. It is the patient's "secrets," the patient's "confidences," and the patient's "information" which constitute the subject matter sought to be protected through the medical profession's code of ethics. Accordingly, because it is the patient's interests that are meant to be protected by the physician's ethics, it is only proper that the patient have the right to rely on his physician to faithfully execute those ethical obligations. Indeed, it would be contrary to common sense for the public to be told on the one hand that the ethical obligations of a physician require the physician to obtain the patient's consent before disclosing the patient's medical confidences, and on the other hand, to be told that a patient has no right to rely on his physician to faithfully execute those ethical obligations. That being the case, we believe the public, and specifically a patient, has the right to rely on physicians to adhere to medical ethics and thereby protect the confidential relationship existing between a patient and his physician.

Other courts which have embraced this issue have repeatedly found that a patient has the right to rely on his physician to execute that physician's ethical duties so as to protect the confidential relationship existing between a patient and his physician. In *Hammonds v. Aetna Casualty & Surety Co.* (N.D. Ohio 1965), 243 F. Supp. 793, for example, the court noted:

> "Almost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, and every patient has a *right to rely* upon this warranty of silence." (Emphasis added.) (243 F. Supp. 793, 801.)

Likewise, the court in *Humphers v. First Interstate Bank* (1984), 68 Or. App. 573, 684 P.2d 581, *aff'd in part, rev'd in part & remanded* (1985), 298 Or. 706, 696 P.2d 527, recognized the patient's right to rely on the physician's faithful execution of his ethical duties:

"[T]here is widespread public knowledge of the ethical standards of the medical profession and widespread belief that confidences made by a patient to a physician may not be disclosed without the permission of the patient. Patients in Oregon have the *right to rely* on this common understanding of the ethical requirements which have been placed on the medical profession." (Emphasis added.) (684 P.2d 581, 587.)

We believe, as stated above, that patients in Illinois possess a similar right; namely, the right to rely on physicians to faithfully execute their ethical duties and thereby protect the confidentiality of the physician-patient relationship. Therefore, since the patient has the right to rely on a physician to execute his ethical obligations, we believe that barring *ex parte* conferences between defense counsel and a plaintiff's treating physician is a necessary corollary of that right, for such conferences are inapposite to the ethical obligations of the physician.

In sum, we believe that the public has the right to rely on physicians to faithfully execute their ethical obligations and thereby protect the confidential relationship existing between patients and their physicians. We also believe that *ex parte* conferences between a patient's treating physician and the patient's legal adversary threaten that confidential relationship in that they involve the discussion of a patient's medical confidences without the patient's consent. That being the case, it is apparent that *ex parte* conferences are contrary to public policy for they place in jeopardy an established and beneficial interest of society, namely, the confidential relationship existing between a patient and his physician.

The second indicia of the public policy prohibiting *ex parte* conferences between a plaintiff's treating physician and defense counsel rests in the fiduciary relationship that exists between a patient and his treating physician. The fiducial nature of the physician-patient relationship flows not from the physician's ethical duties, but rather as a result of the physician's unique role in society. Like the confidentiality of the physician-patient relationship, we believe that our society has an established and beneficial interest in the fiduciary quality of the physician-patient relationship. Thus, conduct which threatens the fiduciary relationship existing between a patient and his physician runs contrary to the interests of society and should, we believe, be prohibited. It is evident, as set forth below, that *ex parte* conferences between defense counsel and a plaintiff's treating physician threaten the fiduciary nature of the physician-patient relationship. Therefore, *ex parte* conferences should be barred as being against public policy.

To begin, it is well settled in Illinois (see, *e.g., Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 403 N.E.2d 1349; *Cannell v. Medical & Surgical Clinic* (1974), 21 Ill. App. 3d 383, 315 N.E.2d 278) and, indeed, throughout the United States (see *Hales v. Pittman* (1978), 118 Ariz. 305, 576 P.2d 493; *Stafford v. Schultz* (1954), 42 Cal. 2d 767, 270 P.2d 1; *Henkin, Inc. v. Berea Bank & Trust Co.* (Ky. App. Ct. 1978), 566 S.W.2d 420; *Warsofsky v. Sherman* (Mass. 1950), 93 N.E.2d 612; *Foshee v. Krum* (1952), 332 Mich. 636, 52 N.W.2d 358; *Henricks v. James* (Miss. 1982), 421 So. 2d 1031; *State ex rel. Stufflebam v. Applequist* (Mo. App. Ct. 1985), 694 S.W.2d 882; *Demers v. Herety* (1973), 85 N.M. 641, 515 P.2d 645; *Estate of Leach v. Shapiro* (1984), 13 Ohio App. 3d 393, 469 N.E.2d 1047) that there exists, between a patient and his treating physician, a fiduciary relationship founded on trust and confidence. As our supreme court has previously noted, a fiduciary relationship exists where:

> "[T]here is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

(*Neagle v. McMullen* (1929), 334 Ill. 168, 175, 165 N.E. 605.) Like the courts cited above, we believe that a patient, in coming to a physician for medical assistance, places a "special confidence" in his treating physician. The physician, in turn, owes a duty of good faith toward his patient. This duty of good faith includes, in our opinion, an obligation on the physician's behalf to deal honestly with his patient and thereby avoid engaging in conduct that undermines the fiducial nature of the relationship. An *ex parte* conference between defense counsel and a plaintiff's treating physician is an example of the type of conduct that undermines the fiducial qualities of the physician-patient relationship.

The existence of this fiduciary relationship indicates that there is more between a patient and his physician than a mere contract under which the physician promises to heal and the patient promises to pay. There is an implied promise, arising when the physician begins treating the patient, that the physician will refrain from engaging in conduct that is inconsistent with the "good faith" required of a fiduciary. The patient should, we believe, be able to trust that the physician will act in the best interests of the patient thereby protecting the sanctity of the physician-patient relationship.

Accordingly, when the patient files suit and places a specific mental or physical condition at issue, we believe that the fiduciary relationship existing between the patient and the physician requires, at the very minimum, that the patient have a right to rest assured that

the physician will act in good faith while, at the same time, the physician complies with court-authorized discovery. Thus, when a patient files suit, the physician should be prepared to release those records relevant to the condition placed at issue, be available to give depositions, and be prepared to testify should he be called upon to do so. However, we also believe that the patient, because of the fiduciary relationship existing between him and his physician, should have the right to expect that his physician will provide the medical information sought by the patient's adversary *pursuant only to court authorized methods of discovery.* (Accord, *Miles v. Farrell* (N.D. Ill. 1982), 549 F. Supp. 82; *Alexander v. Knight* (1962), 197 Pa. Super. 79, 177 A.2d 142.) Discussion of the patient's confidences under any other circumstances, such as the *ex parte* conference, could be inconsistent with the duties of a fiduciary for the physician would, in effect, engage in conduct which may be contrary to a fiduciary's obligation of good faith and, in addition, may be potentially harmful to the interests of the patient in that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit.[3] Consequently, the *ex parte* conference involves conduct which could be violative of the duties of a fiduciary and would, therefore, be contrary to the public policy favoring the fiduciary nature of the physician-patient relationship.

Further, we find that the entire concept of the *ex parte* conference tends to weaken the compelling obligations of a fiduciary. At the very heart of every fiduciary relationship, including that between a patient and his physician, there exists an atmosphere of trust, loyalty, and faith in the discretion of a fiduciary. That being so, we find it difficult to believe that a physician can engage in an *ex parte* conference with the legal adversary of his patient without endangering the trust and faith invested in him by his patient. In other words, we believe that the duties owed by a physician as a fiduciary are such that he should not, in light of the loyalty and trust built into the relationship he has with his patient, engage in an *ex parte* conference with defense counsel.

Courts which have recognized the existence of a fiduciary relationship between a patient and his physician have consistently acknowledged that an *ex parte* conference is contrary to the fiducial obliga-

---

[3]In this respect, we note, without deciding, that many jurisdictions have recognized the existence, on the patient's behalf, of a cause of action for "breach of confidence" where a physician discloses a patient's medical confidences without the patient's consent. See generally Annot., 20 A.L.R.3d 1109 (1968).

tions owed by a physician.

In *Wenninger v. Muesing* (1976), 307 Minn. 405, 240 N.W.2d 333, for example, the court barred defense counsel from engaging in *ex parte* communications with a plaintiff's treating physician finding that such a rule "helps preserve the *complete trust* between a doctor and patient which is essential to the successful treatment of the patient's condition." (Emphasis added.) (307 Minn. 405, 411, 240 N.W.2d 333, 337.) Likewise, the court in *Hammonds v. Aetna Casualty & Surety Co.* (N.D. Ohio 1965), 243 F. Supp. 793, barred *ex parte* conferences noting:

> "[T]he patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well. The introduction into relationship of this *aura of trust*, and the expectation of confidentiality which results therefrom, imposes the fiduciary obligations upon the doctor." (Emphasis added.) (243 F. Supp. 793, 802.)

We agree with the reasoning of the *Wenninger* and *Hammonds* courts and rule that since there is a fiduciary relationship between a patient and his physician, and since *ex parte* conferences are harmful to that relationship, such conferences must be prohibited as against public policy.

In sum, we find that the public has an established and beneficial interest in both the fiducial and confidential qualities of the physician-patient relationship. In addition, the public has an interest, we believe, in having those qualities safeguarded from conduct which places them in jeopardy. These truths, combined with the fact that *ex parte* conferences threaten the sanctity of the physician-patient relationship while producing no additional information (other than that which is already obtainable through the regular methods of discovery), compel us to find that modern public policy prohibits *ex parte* conferences between a plaintiff's treating physician and defense counsel.

## II

■ Tobin next asserts that taking the deposition of a treating physician to obtain that physician's opinion is costly, inefficient, and will cause scheduling problems for both defense counsel as well as the plaintiff's treating physician. A deposition, however, is not the only means available for defense counsel to obtain the opinion of a treating physician. Defense counsel can, if they are concerned about costs and scheduling, obtain the opinion of the treating physician by simply sending him a deposition upon written questions pursuant to Supreme Court Rule 210. (87 Ill. 2d R. 210; Accord, *Alston v. Greater South-*

*east Community Hospital* (D.D.C. 1985), 107 F.R.D. 35.) In addition, defense counsel can obtain copies of all of the plaintiff's relevant medical records from the treating physician pursuant to Supreme Court Rule 214. (87 Ill. 2d R. 214; Accord, *State ex rel. Klieger v. Alby* (1985), 125 Wis. 2d 468, 373 N.W.2d 57). Moreover, we do not believe that the time consumed, as well as the costs involved in the taking of a treating physician's deposition (should the two methods outlined above prove insufficient) creates such hardship that it is necessary for us to carve an exception into the well-established rules of discovery. Accord, *Garner v. Ford Motor Co.* (D. Alaska 1973), 61 F.R.D. 22; *Miles v. Farrell* (N.D. Ill. 1982), 549 F. Supp. 82.

### III

Tobin's third argument is that prohibiting defense counsel from engaging in *ex parte* conferences with a plaintiff's treating physician allows a plaintiff's attorney to "neutralize" experts such as Dr. Tomasi. This argument apparently presumes two facts: (1) that plaintiff's attorneys will intentionally send their clients to be treated by certain members of the medical profession for a purpose other than obtaining medical treatment; and (2) that a treating physician, because he provides a plaintiff with medical treatment, is somehow "neutralized" from telling the truth should he be called upon to do so in a court of law.

In addressing this argument, we first note, and Tobin so acknowledges, that there is no evidence in the record of any unethical, suspicious, or even questionable conduct on the part of the plaintiffs' attorneys regarding the plaintiffs' relationships with their treating physicians. Thus, there is no evidence which suggests that the plaintiffs in the instant case approached their treating physicians for any other reason than medical care and assistance.

■ Moreover, we do not believe that a treating physician is "neutralized" merely because he provides medical assistance to a patient-plaintiff. If, in treating a patient, a physician forms an opinion as to the cause, nature, or extent of a patient's injury, that physician is in no way, as a result of our decision today, prohibited from voicing that opinion in a court of law. It is important to note, in this regard, that the opinion of the treating physician which is disclosed in a deposition is obviously the same opinion as that which defense counsel would obtain in an *ex parte* conference. Consequently, by barring *ex parte* conferences, we do not "neutralize" the opinion of a treating physician; instead, we merely insure that the opinion of that treating physician is disclosed in a manner that not only discovers the truth, but also

protects the confidential and fiduciary relationship existing between a patient and his physician.

## IV

■ Tobin's next claim is based on speculation. Tobin contends the plaintiffs' attorneys will be able to monitor the development of the defense's case (by being present at a treating physician's deposition) and that by doing such, will obtain "enough information to extort unjustified nuisance settlements." We find no merit to this argument. A plaintiff's attorney, by merely being present at a treating physician's deposition, "monitors" nothing more than the questions asked and the answers given. It is well known that the purpose of a deposition, at least as far as a treating physician is concerned, is to allow the interested parties, both the plaintiff and defendant, to learn or "discover" the opinion of that physician. That opinion, as we have noted above (see section III), is the same regardless of whether it is disclosed through a deposition or through an *ex parte* conference. Furthermore, we do not believe that a plaintiff's attorney, by merely being present at the deposition of a treating physician, becomes so inextricably involved with the development of the defense's case that he is able, based on the questions and answers presented in that deposition, to "extort" a settlement out of the defense. Accord, *Wenninger v. Muesing* (1976), 307 Minn. 405, 240 N.W.2d 333.

## V

■ Tobin's fifth assignment of error is that *ex parte* conferences are proper for they are not barred by the code of ethics applicable to attorneys practicing law in Illinois. Tobin argues "The American Bar Association's (ABA) Committee on Ethics has specifically ruled that it is perfectly ethical for defense counsel to interview a plaintiff's treating physician," and cites ABA Committee on Professional Ethics Informal Opinion 892 (1965) and Tennessee Board of Professional Responsibility Formal Opinion 85 F. 86 (1985) as his authority. Tobin's reliance on these two Opinions, however, is misplaced.

The full text of Informal Opinion 892 discloses that it is in no way applicable to attorneys practicing law in a State such as Illinois. The text states:

> "In your letter of September 9, 1965, to the American Bar Association, you raise the question whether the defendant's counsel has the right to interview the plaintiff's attending physician, insofar as principles of legal ethics are concerned.
>
> Answering the question from the point of view of legal eth-

ics, *without regard to any matters involving the laws of your state as to confidential communications to an attending physician and medical ethics*, it is the opinion of this committee that the defendant's counsel may properly interview the plaintiff's attending physician without the presence of the plaintiff's counsel." (Emphasis added.)

As the Opinion set forth above reveals, the ABA Ethics Committee intended the Opinion to apply only where no physician-patient-privilege statute exists. Indeed, the Opinion is qualified; it specifically does not address what impact a State law protecting physician-patient communications has on the question of whether a defense attorney may properly interview a plaintiff's treating physician. Consequently, in a State such as Illinois, where a physician-patient-privilege statute exists, the Opinion of the ABA would certainly be altered for it would have to take into account the ramifications of such a statute.

Furthermore, Opinion 892 specifically does not take into account what effect the medical profession's code of ethics might have on this issue. As set forth in section I, it is clearly contrary to the medical profession's code of ethics for a physician to discuss a patient's confidences with a third party (such as a defense attorney) without first obtaining the consent of that patient. With that in mind, we are confident that the ABA's Opinion would be significantly altered if the Opinion took the medical profession's code of ethics into account.

Thus, Opinion 892 is inapplicable to attorneys practicing law in Illinois for two reasons: (1) Illinois has a physician-patient-privilege statute regulating the disclosure of a patient's confidences; and (2) the medical profession's code of ethics requires patient consent before the physician may discuss the patient's case with a third party. That being the case, we believe that Tobin's reliance on Informal Opinion 892, as sanctioning *ex parte* conferences between defense counsel and a plaintiff's treating physician, is misplaced.

Moreover, our view regarding the effect of Illinois' physician-patient privilege is further supported by an analysis of other authority relevant to this issue. Tobin cites, in addition to the ABA Opinion, Formal Opinion 85 F. 86 from the Tennessee Board of Professional Responsibility as authority for the proposition that defense attorneys may ethically engage in *ex parte* conferences with a plaintiff's treating physician. Tennessee, however, has no physician-patient-privilege statute. Thus, like ABA Informal Opinion 892, the Tennessee Opinion is inapplicable to attorneys practicing in a State such as Illinois for Illinois, unlike Tennessee, has a statute regulating the disclosure of confidential medical information possessed by a treating physician. In

addition, our opinion on this matter is bolstered evermore by the fact that formal and informal ethics opinions from other States (which have a physician-patient-privilege statute like Illinois) have consistently held that it is unethical for a defense attorney to engage in *ex parte* conferences with a plaintiff's treating physician. See, *e.g.*, Committee on Professional Ethics of the Bar Association of Nassau County, Opinion 82—2 (January 6, 1982); Committee on Professional and Judicial Ethics of the State Bar Association of Michigan, Informal Opinion CI—587 (December 12, 1980); San Diego County Bar Association Legal Ethics and Unlawful Practices Committee, Opinion 1983—9 (1983); Akron Bar Association Ethics Committee, Opinion 11 (December, 1983).

Hence, Tobin is misguided in relying on the ABA and Tennessee Opinions set forth above as authority for his proposition that it is "perfectly ethical" for defense counsel practicing in Illinois to engage in *ex parte* conferences with a plaintiff's treating physician. The ABA and Tennessee Opinions fail to take into account Illinois' physician-patient-privilege statute nor do they address what effect the ethics of the medical profession has on this issue. Consequently, we are unwilling to hold that it is "perfectly ethical" for defense counsel to engage in *ex parte* conferences with a plaintiff's treating physician.

## VI

■ Tobin's sixth assertion is that a plaintiff does not have a proprietary right to any person's testimony and, therefore, the plaintiff cannot object to defense counsel engaging in *ex parte* conferences with his treating physician. This argument misses the point. We agree with Tobin that no person owns the testimony of another. But our decision to bar *ex parte* conferences in no way advances or supports such a conclusion. Again, we are not prohibiting a treating physician from expressing his opinions in a deposition or from testifying in a court of law. Nor does our decision infer that a plaintiff has a right to stop his treating physician from so testifying. In addition, it is obvious that a plaintiff, like a defendant, has no right to influence the opinion of the treating physician. That being the case, it is evident that we are not, through our decision to bar *ex parte* conferences between defense counsel and a plaintiff's treating physician, granting a plaintiff a proprietary right in the testimony of his treating physician. To the contrary, we are merely imposing a prohibition on a single type of unauthorized practice which we believe not only jeopardizes the fiduciary relationship between a treating physician and his patient, but also, yields up no recognizable benefit with regard to the information and

evidence obtained through its use.

## VII

█ Tobin next claims that *ex parte* conferences help to facilitate early evaluation and settlement of cases resulting in a decrease in litigation costs and the conservation of judicial resources. This argument's causal relationship, however, is flawed. It is not the *ex parte* conference *in and of itself* that leads to the early settlement of a case. Rather, it is the *information* that is obtained during that *ex parte* conference that leads to a case's settlement. That same "settlement causing" information can be obtained, as we have noted previously, by obtaining a copy of the plaintiff's medical records or through a deposition of the plaintiff's treating physician. These latter methods will provide defense counsel with the same information that they would obtain in an *ex parte* conference (and thus facilitate the early evaluation and settlement of cases) without jeopardizing that physician's fiduciary obligation to his patient. Consequently, because the information leading to potential settlements is ultimately obtained by defense counsel, we do not believe that judicial resources will be conserved to any greater degree simply because defense counsel are permitted to engage in *ex parte* conferences with a plaintiff's treating physician.

## VIII

█ Tobin also cites the authority of the trial court as a justification for permitting *ex parte* conferences. According to Tobin, motions *in limine* and protective orders provide the necessary remedies should defense counsel ever abuse their right to engage in *ex parte* conferences with a plaintiff's treating physician.

It is true that a trial court has the power to enter protective orders and grant motions *in limine* where appropriate. But we question whether a protective order or a motion *in limine* can realistically restore a patient's trust and confidence in his treating physician after it has been disclosed that the physician whom the plaintiff approached for help has been, without the patient's consent or knowledge, engaging in private conferences with that patient's legal adversary. While a protective order and motion *in limine* are effective tools to insure compliance with the rules of evidence, we do not believe that an "after the fact" ruling by a trial court will sufficiently remedy the potential breaches of trust that will occur should defense counsel be given an unfettered right to engage in *ex parte* conferences with a patient's treating physician.

## IX

■■ Tobin's ninth argument is that *ex parte* conferences are not prohibited by either the Illinois rules of civil procedure or the supreme court rules and as a result, *ex parte* conferences should be permitted. Tobin cites the Illinois Pattern Jury Instruction (Illinois Pattern Jury Instruction, Civil, No. 2.06 (2d ed. 1971)) which states:

> "An attorney has a right to interview a witness for the purpose of learning what testimony the witness will give. The fact that the witness has talked to an attorney and told him what he would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness."

Tobin reads this instruction literally and claims that through it, the supreme court has implicitly assented to defense counsel engaging in *ex parte* conferences with a plaintiff's treating physician. We do not agree.

Illinois Pattern Jury Instruction, Civil, No. 2.06 "is an attempt to offset the ancient trick in which an attorney questions a witness as to his interview with opposing counsel, often stated in a way to imply to the witness and jurors that this is an impropriety." (*Dorf v. Egyptian Freightways, Inc.* (1962), 39 Ill. App. 2d 2, 4, 188 N.E.2d 103.) We agree with the *Dorf* court's interpretation of No. 2.06 and believe that it was promulgated for the single purpose of insuring that juries do not discount a witness' testimony merely because that witness had previously talked to an attorney for one of the litigants. Accordingly, we believe that Tobin's reliance on IPI Civil 2d No. 2.06 as being evidence of the supreme court's approval of *ex parte* conferences between a patient and treating physician is misplaced.

■■ We likewise are compelled to reject Tobin's claim that he is permitted, under the Code of Civil Procedure, to engage in *ex parte* conferences with a plaintiff's treating physician. Tobin repeatedly asserts that he has a "right" to engage in *ex parte* conferences with a plaintiff's treating physician but fails to identify the rule or statute which grants him that right. Tobin apparently believes that defense counsel are permitted to engage in *ex parte* conferences with a plaintiff's treating physician merely because the Illinois rules of civil procedure do not explicitly prohibit such. We find this position to be flawed.

The Illinois rules of civil procedure do not specifically address whether defense counsel should be permitted to engage in *ex parte* conferences with a plaintiff's treating physician. Nevertheless, we believe that the legislature's position on this subject can be gleaned from an analysis of the physician-patient-privilege statute.

In creating the physician-patient privilege, the legislature recog-

nized that members of society who approach a physician for treatment should, and do, have a right to be free from the embarrassment and invasion of privacy that often accompanies the disclosure of confidential medical information. (See *People v. Bickham* (1982), 89 Ill. 2d 1, 431 N.E.2d 365.) This right, however, is not absolute and the statute, accordingly, contains several exceptions wherein the legislature deemed that the protection afforded by the physician-patient privilege ought give way to the public's desire to ascertain the truth. (See Ill. Rev. Stat. 1983, ch. 110, pars. 8—802(1) through (8).) Thus, for example, when an individual files suit and places his mental or physical condition at issue, that individual implicitly consents, by filing that lawsuit, to a waiver of the physician-patient privilege as to that specific mental or physical condition. (*Webb v. Quincy City Lines, Inc.* (1966), 73 Ill. App. 2d 405, 219 N.E.2d 945.) Consequently, the patient-turned-plaintiff cannot object to the release of medical records regarding the condition to his treating physicians giving testimony regarding the condition, and even, where appropriate, to being physically examined by a physician employed by his adversary concerning the condition at issue.

The privilege and the relevant exceptions applicable thereto (Ill. Rev. Stat. 1983, ch. 110, pars. 8—802(2), (3), (4)) reflect a sound public policy which respects both society's desire for privacy and its desire to see that the truth is reached in civil disputes. (*Parkson v. Central Du Page Hospital* (1982), 105 Ill. App. 3d 850, 435 N.E.2d 140.) Of key importance is the legislature's determination that it be the patient who, by affirmative conduct (the filing of a lawsuit), consents to the disclosure of his previously confidential medical information. Thus, members of the public who file suit regarding a specific condition realize that upon doing so, the *information regarding that condition* will be lawfully disclosed not only to their adversary, but to the public forum as well.

However, we do not believe, and there is no evidence to suggest, that the legislature, by creating a consensual waiver of the physician-patient privilege, intended that a member of the public also consents, by simply filing suit, to his treating physician engaging in *ex parte* conferences with the attorneys representing that individual's legal adversary. We are unwilling to accept the proposition that the legislature intended the consensual waiver of the physician-patient privilege (see Ill. Rev. Stat. 1983, ch. 110, par. 8—802(4)) to apply to anything more than the information necessary to ascertain the truth.

It is significant to note, as we stated above, that in creating the physician-patient privilege and the relevant exceptions thereto, the

legislature was concerned with balancing society's interest in maintaining a confidential relationship between a patient and his physician with society's interest in ascertaining the truth in civil lawsuits. With that being the case, we are unable to discern how *ex parte* conferences would, in any way, act to foster either of those societal interests. As mentioned previously, there is no suggestion that Tobin, using the regular channels of discovery, is unable to obtain all of the relevant medical information and evidence that he is entitled to receive. Thus, society's interest in ascertaining the truth in civil disputes is wholly satisfied. Society's interest in preserving the confidential nature of the physician-patient relationship is, through our decision to bar *ex parte* conferences, also fostered, for members of the public who look to the court system for justice will know that although they have consented to the release of information regarding the condition placed at issue, they have not, by instituting litigation, automatically consented to a complete breakdown of the trust and confidentiality embodied in the physician-patient relationship.

In sum, we believe that when a person files suit and places his mental or physical condition at issue, that person consents to the release of all of the information related to the condition placed at issue. We do not believe, however, that the legislature intended that a person also consents, by filing a lawsuit, to his treating physician engaging in *ex parte* conferences with that person's legal adversary.

Furthermore, there is an additional problem that could emerge should the Illinois rules of civil procedure or the supreme court rules be interpreted so as to permit defense counsel to engage in *ex parte* conferences with a plaintiff's treating physician. If, as able defense counsel suggests, the rules do permit such conferences, then those rules, whether they be the rules of civil procedure or the supreme court rules, would become operative the moment the plaintiff commenced his action. Thus, defense counsel would have the right, under Tobin's analysis, to approach and attempt to discuss the plaintiff's medical condition with each of the plaintiff's treating physicians immediately, without the patient's knowledge or consent, *even if that physician was continuing to treat that patient-plaintiff.* Under these circumstances, an *ex parte* conference between defense counsel and a plaintiff's treating physician could lead to a situation wherein the interests of the physician are placed at odds with the interests of the patient.

In *Miles v. Farrell* (N.D. Ill. 1982), 549 F. Supp. 82, the court addressed such a scenario. In *Miles*, a minor brought a malpractice action against the defendant. The minor's parents were deposed and

disclosed that a Dr. Flynn was currently treating their son. Immediately after that deposition, defense counsel approached and convinced Dr. Flynn to act as an expert witness in their case *against the patient Dr. Flynn was currently treating.* From that point on, Dr. Flynn continued to treat the minor plaintiff while, at the same time, he was employed by defense counsel as an expert witness for the purpose of testifying against the minor plaintiff. In addition, Dr. Flynn never disclosed his employment relationship with defense counsel to the minor's parents. On motion of the plaintiff, the *Miles* court barred Dr. Flynn from testifying finding:

"Dr. Flynn owes a fiduciary duty of confidentiality to his patient. As a general rule, a treating physician may not discuss his patient's medical condition with opposing counsel except pursuant to discovery authorized under the applicable rules of civil procedure."

The *Miles* court continued:

"In addition to owing a fiduciary duty of confidentiality, as an expert employed by the defendant Dr. Flynn had a clear conflict of interest which he had an obligation to disclose to his patient." 549 F. Supp. 82, 84.

We agree with the position taken by the *Miles* court and in doing so, refuse to interpret the supreme court rules or the rules of civil procedure in a manner that would allow defense counsel to approach a plaintiff's treating physician for the purpose of discussing, *ex parte*, that plaintiff's medical condition while the plaintiff remains under the care and supervision of that treating physician. It takes no stretch of the imagination to recognize the conflicts of interest that may arise should the supreme court rules or the rules of civil procedure be read in a manner that would permit defense counsel to have an unfettered right to engage in private *ex parte* conferences with a plaintiff's treating physician. Indeed, such a conflict of interest could possibly stand in the way of the plaintiff receiving proper medical care. Accordingly, we are compelled to reject Tobin's suggestion that the supreme court rules or the rules of civil procedure permit *ex parte* conferences between a plaintiff's treating physician and defense counsel.

## X

■ Tobin's final contention, based on the waiver of the physician-patient-privilege theory, is that prohibiting *ex parte* conferences is tantamount to standing in the way of ascertaining the truth. This, however, is nothing more than a bald assertion. Again, Tobin has, in no way, either in his brief or during oral argument, identified a *single*

piece of information or evidence which he can obtain through an *ex parte* conference that he cannot already obtain through the methods of discovery outlined by Supreme Court Rule 201 (87 Ill. 2d R. 201). Moreover, our research discloses that not one court has found it necessary to permit *ex parte* conferences in order that the truth may be ascertained in a civil dispute. A rule barring *ex parte* conferences, therefore, does not stand in the way of discovering the truth; it merely regulates the discovery process so as to protect the confidential relationship existing between a patient and his treating physician. No "truth" is kept out of court, for the treating physician, as we stated above, is free to testify as to his opinions and conclusions regarding the mental or physical condition placed at issue in the plaintiff's lawsuit.

We now address those arguments based on the second theory advanced by Tobin, namely, that the trial court's order barring him from engaging in *ex parte* conferences with the plaintiffs' treating physicians violates Tobin's first amendment freedom of speech rights.

## XI

Tobin advances two alternative arguments based on the first amendment: (1) the trial court's order constituted an unconstitutional prior restraint; and (2) that even if the trial court's order was not an unconstitutional prior restraint, nevertheless, the court's order was an impermissible time, place or manner restriction.

Initially we note that Tobin's constitutional arguments are based on a questionable theory, for Tobin essentially asserts that he has an unfettered right to speak to plaintiffs' treating physicians; conduct which involves, absent patient consent, the inducing of a physician to breach that physician's ethical duties (see section I). Moreover, whether an attorney may ethically partake in *ex parte* conferences with a plaintiff's treating physician in Illinois (a State where a physician-patient-privilege statute exists) is, at the very least, an unsettled question (see opinions cited in section V). Also, this is not a case involving the freedom of the press to publish, nor does it involve, in any way, information that can be even remotely considered to be a topic of public concern. Although Tobin's position does suffer from these infirmities, we will, nevertheless, address his arguments.

## XII

Tobin first claims that the trial court's order amounts to an unconstitutional prior restraint. We do not agree.

Where a court restricts the speech of a private person, that re-

striction can be sustained only if it can be shown that the court's restriction is a precisely drawn means of serving a compelling State interest. (*Consolidated Edison Co. v. Public Service Com.* (1980), 447 U.S. 530, 540, 65 L. Ed. 2d 319, 330, 100 S. Ct. 2326, 2335.) In the case at bar, the trial court's restriction was precise; Tobin was barred from speaking *ex parte* to the plaintiffs' treating physicians regarding the mental or physical condition of the plaintiffs. The restriction also served compelling State interests, namely: (1) the right of privacy possessed by the patient-plaintiffs; and (2) the confidential and fiduciary relationship existing between a patient and his physician. Thus, the trial court's order was precisely drawn and was necessary to serve a compelling State interest. Accordingly, we reject Tobin's assertion that the trial court's order barring him from engaging in *ex parte* conferences with the plaintiffs' treating physicians constitutes an unconstitutional prior restraint.

The authority cited by Tobin is clearly distinguishable from the case at bar. Tobin cites *Cada v. Costa Line, Inc.* (N.D. Ill. 1981), 93 F.R.D. 95, and *In re Grand Jury Proceedings* (W.D. Va. 1983), 558 F. Supp. 532, as support for his assertion that the trial court's order is an unconstitutional prior restraint. In both *Cada* and *Grand Jury*, the courts applied a balancing test which weighed the parties' free speech rights against the governmental interests involved. In both cases, however, no compelling interest on the State's behalf was present. In the present case, the State has a compelling interest in protecting the privacy rights of individual patients and in protecting the confidential and fiduciary relationship existing between patients and their physicians. Thus, the holdings of the *Cada* and *Grand Jury* cases are distinguishable from the present case.

Nor do we believe that the recent Illinois Supreme Court case of *Kemner v. Monsanto Co.* (1986), 112 Ill. 2d 223, requires a different result. In *Kemner*, the trial court issued an order barring the defendant from releasing any information to the press about a pending lawsuit. On appeal, the supreme court found that the trial court's order violated the defendant's first amendment freedom of speech rights. The *Kemner* court came to this conclusion only after it employed a balancing test wherein the first amendment rights of the defendant were weighed against the plaintiff's right to a fair trial guaranteed by the fourteenth amendment. (112 Ill. 2d 213, 244-45.) Because the record contained no evidence that a "clear and present danger or a serious and imminent threat to the fairness and integrity of the trial" (allegedly created by the defendant's press releases) existed, the balancing of interests fell in favor of the defendant and the infringe-

ment on the defendant's first amendment rights was therefore held to be intolerable. 112 Ill. 2d 213, 245-46.

In the present case, we believe, like the *Kemner* court, that the proper resolution of this case rests in the utilization of a balancing test: we must weigh the State's interest in the confidential and fiduciary relationship existing between a patient and his physician and in the privacy rights of the patient-plaintiffs against Tobin's claim that he is free to confer with the plaintiffs' treating physicians even though such conferences are not authorized by the rules of discovery.

We conclude, upon balancing the interests set forth above, that the sanctity of the physician-patient relationship combined with the privacy rights of the patient-plaintiffs is of paramount importance and that they should therefore take precedence over Tobin's alleged right to confer privately with the plaintiffs' treating physicians. Unlike the *Kemner* case (which involved a trial court's order affecting only the parties to the lawsuit), the instant action involves relationships inherently beneficial to society involving the rights and interests of physicians and patients across the State. Accordingly, because the balance of interests favors such, we find that the trial court's order prohibiting Tobin from engaging in *ex parte* conferences with the plaintiffs' treating physicians does not infringe upon Tobin's freedom of speech rights.

## XIII

■■ We are likewise compelled to reject Tobin's claim that the trial court's order constituted an unreasonable time, place, and manner restriction. The United States Supreme Court has recognized that reasonable time, place and manner restrictions are permissible where they serve a significant governmental interest and leave ample alternative channels for communication. (*Consolidated Edison Co. v. Public Service Com.* (1980), 447 U.S. 530, 65 L. Ed. 2d 319, 100 S. Ct. 2326; *Linmark Associates, Inc. v. Willingboro* (1977), 431 U.S. 85, 52 L. Ed. 2d 155, 97 S. Ct. 1614.) The essence of a valid time, place or manner restriction lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate government interests. *Consolidated Edison Co. v. Public Service Com.* (1980), 447 U.S. 530, 535, 65 L. Ed. 2d 319, 326-27, 100 S. Ct. 2326, 2332.

Applying those principles to the case at bar, it is obvious that the trial court's order barring Tobin from engaging in *ex parte* conferences with the plaintiffs' treating physicians survives constitutional muster for it serves a significant State interest and allows alternative

channels for communication. The State and judiciary certainly have a significant, if not compelling, interest in protecting the confidential and fiduciary relationship existing between a patient and his treating physician. Moreover, the State has a significant interest in safeguarding the privacy rights of individual patients. Thus, that the State has a significant interest in restricting defense counsel from speaking *ex parte* to a plaintiff's treating physician cannot be doubted.

There is also an alternative channel through which Tobin can communicate to a plaintiff's treating physician. Tobin is fully able to utilize the discovery process as a means to communicate to a plaintiff's treating physician and can thereby obtain all of the information to which he is entitled (see section IX).

Hence, we believe that the trial court's order barring Tobin from engaging in *ex parte* conferences with the plaintiffs' treating physicians constituted a valid time, place and manner restriction. The order served a significant government interest and left open alternative channels through which Tobin can communicate to the plaintiffs' treating physicians. As a result, we reject Tobin's claim that the trial court's order barring him from engaging in *ex parte* conferences is an unconstitutional time, place or manner restriction.

In sum, we find that the trial court's order survives constitutional muster for it does not amount to a prior restraint nor does it constitute an unreasonable time, place or manner restriction.

Finally, it is true, as Tobin points out, that many courts have permitted defense counsel to engage in *ex parte* conferences with a plaintiff's treating physician. (See, *e.g., Doe v. Eli Lilly Co.* (D.D.C. 1983), 99 F.R.D. 126; *Orr v. Sievert* (1982), 162 Ga. App. 677, 292 S.E.2d 548; *Stempler v. Spiedell* (1985), 100 N.J. 368, 495 A.2d 857; *Lazorick v. Brown* (1984), 195 N.J. Super. 444, 480 A.2d 223.) We find the reasoning of these decisions, however, to be flawed for they attempt to deal with a question of great societal importance by merely looking to a set of codified rules and procedures for the answer. Indeed, those decisions which permit *ex parte* conferences fail to acknowledge that a physician is *ethically required not to speak* to a third party regarding a patient's confidences absent patient consent (see section I). Moreover, a decision permitting *ex parte* conferences demonstrates a gross lack of regard for the confidential and fiduciary relationship existing between a patient and his physician (see section I). And finally, a decision to allow *ex parte* conferences neglects to take into account the modern public policy that favors the confidentiality of the physician-patient relationship and thereby prohibits, because of the threat posed to that relationship, *ex parte* conferences

between defense counsel and a plaintiff's treating physician.

We believe that this issue, namely, whether defense counsel may properly engage in *ex parte* conferences with a plaintiff's treating physician, is best decided by relying on principles of public policy, obligations created by confidential and fiduciary relationships, and the ethical responsibilities of modern-day professionals.

Accordingly, for the reasons set forth above, we rule today that discussions between defense counsel and a plaintiff's treating physician should be pursuant to the rules of discovery only. That being the case, the decision of the circuit court of Cook County finding Tobin to be in contempt of court is affirmed.

Affirmed.

JOHNSON and McMORROW, JJ., concur.