FREDERICO BAYLAENDER, as Special Adm'r of the Estate of Maria Baylaender, Deceased, *et al.*, Plaintiffs-Appellants, v. MARGARET METHOD, as Special Adm'r of the Estate of Harold Method, Defendant-Appellee.

First District (5th Division)   No. 1—89—3378

Opinion filed June 5, 1992.—Rehearing denied July 2, 1992.

James H. Canel, Ltd., of Chicago, for appellants.

Pretzel & Stouffer, Chartered, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

In this survival and wrongful death action brought on behalf of the estate of Maria Baylaender and for the benefit of her husband, Frederico Baylaender, and children, Carla, Richard and Chiara, it is alleged that Maria died as a result of Dr. Harold Method's failure to diagnose her breast cancer in December 1977 or May 1978. Plaintiff appeals from a jury verdict in favor of the defendant. For the reasons set forth below, we reverse and remand for a new trial.

FACTS

On May 30, 1980, Maria Baylaender and Frederico Baylaender filed a two-count complaint against Dr. Harold Method. In count I, Maria Baylaender alleged negligence by Dr. Method in failing to diagnose or treat her cancer during December 1977 and May 1978 examinations. Count II alleged loss of consortium by Frederico Baylaender as a result of Dr. Method's negligence. Following Mrs. Baylaender's death in December of 1980, the complaint was amended to assert a wrongful death action on behalf of Frederico, Carla, Richard and Chiara Baylaender, and a survival action on behalf of her estate.

Although Dr. Method died during the pendency of this action and his wife, Margaret Method, as administrator of his estate was substituted as defendant, in this opinion "defendant" shall refer to Dr. Method.

Prior to trial, plaintiff filed a motion *in limine* seeking to bar the testimony of Dr. Harry Southwick, the physician who treated

Maria subsequent to Dr. Method's alleged negligence, pursuant to *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952. Plaintiff contended that Dr. Southwick violated the physician-patient privilege when he discussed Maria Baylaender with an attorney assigned to represent him by his insurance carrier although he was not sued. The same attorney was subsequently assigned by the carrier to represent the defendant, Dr. Method. Both Dr. Southwick and Dr. Method were insured by the same insurer, Illinois State Medical Society. The motion was denied.

The trial began with the reading of portions of Dr. Method's discovery deposition. At that deposition, Dr. Method was represented by the same attorney who had previously represented Dr. Southwick. Dr. Method testified that his only record of Maria Baylaender's visit on December 6, 1977, was a note in his office record: "CC lump in breast. See letter to Drs. Gerbie & Raimondi."

At trial, the plaintiff, Dr. Frederico Baylaender, testified that on December 1, 1977, while making love to his wife Maria, he felt a small, hard, pea-sized lump in the upper outer quadrant of her left breast. Because of his concern, he directed Maria to have a xeromammography the following day at Louis A. Weiss Memorial Hospital. Dr. Baylaender, a radiologist at Weiss, read the mammograms and found them to be negative.

Realizing that mammograms may yield false negative results, Baylaender called Dr. Albert Gerbie, a colleague and Maria's gynecologist, and asked him to see Maria that evening. Dr. Gerbie agreed, and examined Maria after his office hours on the evening of December 2, 1977. Dr. Gerbie told the Baylaenders that they should see a surgeon, and suggested the defendant, Dr. Harold Method.

On December 6, 1977, Dr. Baylaender took Maria to see Dr. Method. After examining Maria, Dr. Method told Dr. Baylaender "Don't worry, this is fibrocystic disease. Come back in six months." According to Dr. Baylaender, he specifically asked Dr. Method about doing a biopsy of the lump and was assured that the lump was benign.

Continuing his testimony, Dr. Baylaender said that from December 1977 through May 1978, the mass remained in the same location in Maria's breast. It grew larger, until by the end of April it was the size of a walnut. Maria also told her husband that the mass hurt.

On May 12, 1978, Maria went to see Dr. Method again. Following his examination, Dr. Method telephoned Dr. Baylaender and

again assured him that Maria had fibrocystic disease, told him to stop worrying, and to have Maria return in six months.

Dr. Baylaender testified that he was convinced that he and Dr. Method were not talking about the same mass, as he believed it was impossible for Dr. Method to fail to locate a hard mass the size of a walnut. Therefore, Dr. Baylaender decided to consult with another surgeon who specialized in breast cancer. An appointment was made with Dr. Harry Southwick for May 22, 1978. According to Dr. Baylaender, there was no appreciable change in the mass in Maria's left breast between May 12 when she saw Dr. Method and May 22 when she saw Dr. Southwick.

After examining Maria, Dr. Southwick scheduled a biopsy for June 12, 1978. The biopsy, performed at Presbyterian-St. Luke's Hospital, indicated cancer, and a mastectomy was performed three days later. Cancer was also found in 12 of 24 lymph nodes removed. In spite of the mastectomy and several courses of chemotherapy, Maria died on December 3, 1980, survived by her husband and three children. The cause of death was cancer which had metastasized to her liver, lung, and abdomen.

The trial continued with the reading of the evidence deposition of Dr. Daniel Hizer, who as a medical student took Maria Baylaender's medical history on her admittance to Presbyterian-St. Luke's Hospital in June 1978. Mrs. Baylaender told him she first discovered a mass in her left breast six months earlier. At that time, the mass was "like a cherry pit." In the last two to three months the mass had grown two to three times its original size and had become hard. The mass also had become painful. Dr. Hizer also examined Mrs. Baylaender and recorded finding an 8- to 10-centimeter hard mass in the left breast extending into the upper outer quadrant.

The evidence deposition of Dr. Richard Kaiserman was also read. As an intern he also interviewed Mrs. Baylaender when she was admitted to the hospital. He concurred in the history as recorded by Dr. Hizer. His physical examination noted a 6- by 8-centimeter irregular mass in the upper outer quadrant of the left breast.

Dr. Tilden Everson testified as an expert for the plaintiff. He opined that Dr. Method deviated from the standard of care on December 6, 1977, and on May 12, 1978, and that those deviations contributed to Maria Baylaender's death. He stated that in his opinion the defendant was negligent in not performing a biopsy on the mass Maria Baylaender complained of at the time of her initial visit in December 1977 and again in May 1978. Dr. Everson said that when a surgeon detects a discrete solitary mass, the standard of

care requires that a biopsy be done. Without a biopsy, the possibility of breast cancer cannot be excluded and there was no basis to assure the patient or her husband that there was no malignancy.

Dr. Everson testified that in forming his opinion, he had reviewed defendant's office records which indicated that on December 6, 1977, Maria's chief complaint was a lump in the breast. In a letter which Dr. Method wrote to Dr. Gerbie regarding the December 6 examination, he referred to a "questionable mass or masses in the left breast." There is no reference from the physical examination as charted by defendant to a mass in the upper outer quadrant of the left breast. To Dr. Everson this indicated that the defendant never palpated the mass in Maria Baylaender's left breast. Based on Dr. Baylaender's description and the history given by Maria Baylaender upon her admittance to the hospital, Dr. Everson was of the opinion that the mass was present when Maria saw the defendant on December 6, 1977, and that Dr. Method deviated from the standard of care by not subjecting the mass to a biopsy.

Dr. Everson then reviewed the defendant's records of the May 12, 1978, visit. On that visit, Dr. Method noted Maria's complaint as referring to the lateral quadrant of the left breast. His records included the following notation: "In the lateral quadrant of the left breast, one centimeter beyond the areola between 9:00 and 10:00 o'clock, there is a grapelike cluster of small tiny exquisitely tender cysts." Dr. Everson noted that in the left breast the references to "lateral quadrant" and "between 9:00 and 10:00 o'clock" are inconsistent. Dr. Everson's opinion was that the mass was present when Maria saw the defendant on May 12; that the defendant failed to palpate the mass; and that such failure was a deviation from the standard of care.

Based on the type of tumor discovered following the mastectomy, it was Dr. Everson's opinion that had the cancer been diagnosed in December, Maria's prognosis for survival was 85% to 90%. Had the defendant's treatment conformed to the standard of care in May 1978, Maria Baylaender would not have developed metastatic disease.

On cross-examination, defense counsel asked Dr. Everson whether he had reviewed any literature in preparing his testimony. Dr. Everson indicated that he had reviewed Sabaston's Textbook of Surgery and Schwartz's Textbook of Surgery. Defense counsel then asked the witness about two other textbooks, specifically whether he considered them authoritative (which he did), had used them in teaching (which he had not), or had reviewed them in preparation

for this case (which he had not). Questions were also asked about pamphlets produced by the American Cancer Society, the Journal of Cancer, and the Journal of the American Medical Association. Dr. Everson was generally familiar with the pamphlets and journals and considered them authoritative. Counsel also asked about several other reports on breast cancer and its treatment published by the American Cancer Society, and Dr. Everson stated he was not familiar with them. No questions were asked about any specific passages or content of the books or pamphlets.

At the conclusion of Dr. Everson's testimony, counsel for the plaintiff moved to strike the cross-examination as it related to the textbooks and pamphlets. Counsel argued that it was improper cross-examination to ask an expert witness if he is familiar with a particular book, whether he considers it authoritative, without confronting the witness with inconsistencies for purposes of impeachment. The court denied the motion.

The next witness for the plaintiff was Dr. Albert Gerbie. He testified that when he first saw Maria Baylaender as a patient in August of 1977, he found that she had fibrocystic disease. Dr. Gerbie explained that this is a condition in which ducts within the breasts fill with fluid. He could feel small, little soft nodules in the breast. He also ordered a mammogram, which was negative.

Dr. Gerbie next saw Maria Baylaender in December 1977. Although he had no independent memory of advising her to see a surgeon, his records indicate that she was referred to Dr. Method.

Dr. Gerbie's record of his May 12, 1978, examination with Maria indicated "breasts changed. *** Left breast cystic, especially upper outer quadrant. Conglomeration of cysts—firm—two centimeters." Maria told Dr. Gerbie that she had an appointment with Dr. Method later that day. Had she not had that appointment, Dr. Gerbie testified that he would have advised her to see a surgeon.

On cross-examination, Dr. Gerbie stated that his records did not indicate that he found a hard, pea-sized nodule in December of 1977. Nor did his records show that he found a hard, walnut-sized mass in May of 1978.

Following Dr. Gerbie's testimony, plaintiff rested his case.

Defendant's first witness was Dr. Myles Cunningham. Dr. Cunningham expressed his expert opinion that the defendant met the standard of care in his treatment of Maria Baylaender in December 1977 and May 1978. According to Dr. Cunningham, the standard of care does not require a physician to biopsy every new nodule in the breast, especially in a patient such as Mrs. Baylaender with fibro-

cystic disease. He opined that Dr. Method's letter to Dr. Gerbie in December of 1977 indicated that Dr. Method performed a careful, systematic examination. In Cunningham's opinion, Dr. Method's failure to biopsy the mass in December of 1977 and May of 1978 was a matter of judgment and not a deviation from the standard of care.

In forming his opinion, Dr. Cunningham had reviewed the records of the defendant, and also those of Drs. Gerbie and Southwick. He had also reviewed the depositions of the defendant and the mammograms of Maria Baylaender.

In his testimony, Dr. Cunningham referred to two diagrams. One was a hand-drawn diagram made by Dr. Method during his discovery deposition. This diagram showed two breasts, and Dr. Method had made notations on the diagram which purported to be his findings made during his examinations of Maria Baylaender. Also on the diagram was a notation written by Dr. Method's attorney which stated "Nothing in medial or lateral quadrant." The second diagram was identical to the first except that the handwritten notations of Dr. Method and of his attorney had been typed. Plaintiff had unsuccessfully sought to have these diagrams excluded.

Dr. Cunningham further testified that in his opinion Maria Baylaender's prognosis was the same in 1977 as it was in 1978. Even had her cancer been diagnosed in December of 1977, she would have died at exactly the same time.

On cross-examination, Dr. Cunningham stated that in forming his opinions in this case, he reviewed the medical records of Dr. Method, including the diagrams prepared by Dr. Method during his discovery deposition at the direction of his attorney. In Dr. Cunningham's opinion, those diagrams failed to indicate the presence of any lump in the upper outer quadrant of the left breast. Dr. Cunningham admitted that in rendering an opinion he did not ordinarily rely on diagrams prepared by a physician and his attorney in the course of litigation. Dr. Cunningham agreed that there was nothing in Dr. Method's records that indicated that he "appreciated" what Maria had related to him, a complaint about a new dominant mass in the left breast. In addition, Dr. Cunningham conceded that a dominant hard mass should be biopsied, and that if there was such a mass and Dr. Method did not find it, that would be a deviation from the standard of care. However, it was his opinion that no such mass existed in December of 1977. Nor was there any indication in the records of Drs. Method, Southwick or Gerbie that they detected such a dominant hard mass in May of 1978.

The defendant's evidence deposition, taken prior to his death, was read to the jury. He described his procedure for examining a patient, a procedure which he followed during his examination of Maria Baylaender. Referring to his office records and the letter he sent to Dr. Gerbie, Dr. Method testified that he first saw Maria Baylaender on December 6, 1977. His physical examination of Maria indicated no palpable masses in the right breast except for small, shot-sized nodules, and "similar findings in the left subareolar area, extending inferiorly."

In his testimony Dr. Method referred to a diagram marked "Breast Examination of December 6th, 1977," which he had drawn at the request of his counsel during his earlier discovery deposition. As noted above in connection with Dr. Cunningham's testimony, the diagram showed two breasts. At counsel's request, Dr. Method had written on the diagram the "findings" which he had described in his oral testimony.

Dr. Method also testified that he saw Maria on May 12, 1978. At that time she reported pain in the upper outer quadrant of the left breast, a complaint different in Dr. Method's mind from the one presented in December. Dr. Method testified that he found a grape-like cluster of tenderness in that quadrant, a different finding than that noted in his December examination of Maria. At his attorney's request, a diagram was also made of the May 12, 1978, examination, and Dr. Method wrote his findings on that diagram as well.

Regarding the diagrams, Dr. Method admitted that they were not prepared as part of any office record, but were done at the time of his discovery deposition. In addition to Dr. Method's own notations on the diagrams, there was the notation of his attorney stating "Nothing in medial or lateral quadrant." Dr. Method's attorney stated for the record that he had Dr. Method's handwritten notations and his own handwritten notation typed on another version of the diagram.

When asked on cross-examination about the fact that the letter to Dr. Gerbie regarding the December examination made no mention of the lateral quadrant of the left breast, Dr. Method responded that it was his practice only to document positive findings and in December of 1977 he did not palpate a mass in the left breast.

The final witness was Dr. Harry Southwick. Prior to his testifying, plaintiff's counsel renewed his earlier motion *in limine* to bar Dr. Southwick's testimony. This motion was based on the fact that Dr. Southwick was a subsequent treating physician of Maria Bay-

laender, and he communicated with and discussed the case with an attorney, the same attorney later assigned to represent the defendant Dr. Method, outside the presence of the plaintiff and without plaintiff's consent. The motion was again denied.

Dr. Southwick testified that he examined Maria Baylaender on May 22, 1978. He found that she had fibrocystic disease. In addition, there was one large area in the upper outer quadrant of the left breast that was "a little different from the breast tissue elsewhere." According to Dr. Southwick, it did not feel like cancer, but based on the fact that it seemed different from the other lumpiness in the breasts, Dr. Southwick recommended a biopsy of her left breast. Notwithstanding his decision to biopsy, Dr. Southwick opined that Dr. Method's decision not to perform a biopsy was within the standard of care.

On cross-examination, Dr. Southwick said that subsequent to his treatment of Maria Baylaender, an attorney representing Mrs. Baylaender contacted him and requested a copy of his records. Southwick testified that the Baylaenders' attorney assured him that all he wanted to do was to discuss those records with him, and that he was not the focus of any litigation. Nevertheless, upon receipt of this request, Dr. Southwick contacted the Illinois State Medical Society.

Continuing his testimony, Dr. Southwick said that an attorney was assigned by the medical society to represent him. Dr. Southwick discussed Maria Baylaender and his care and treatment of her with this attorney, and the attorney was present when Dr. Southwick met with the Baylaenders' attorney on May 7, 1979. Dr. Southwick made the following entry into his records regarding that meeting:

> "A meeting was held this morning with the Baylaender's [sic] attorney, *** and [the attorney assigned by the insurance carrier] as my legal representative. We discussed some of Dr. Methods [sic] notes and the description that I have of the lesion and the description he gave are quite a bit different. As I pointed out to [the Baylaenders' attorney] this could be differences in phasiology [sic] but it is still a clinical judgment decision as to which nodule should be removed and which can be safely observed and I know of no hard and fast rule when presented with a nodule such as Mrs. Baylander [sic] had. I happened to be right."

On redirect examination, this record was admitted over plaintiff's objection.

In a deposition taken prior to trial, Dr. Southwick stated that he would not talk to any potential plaintiff's attorney without first being sure he was represented by counsel also. In addition, Dr. Southwick believed the Illinois State Medical Society had "urged" or "instructed" its doctors to contact the society any time there was any contact with any plaintiffs' lawyers. At the time of Dr. Southwick's deposition, when it was clear that he was not a defendant, another attorney from a different law firm had been assigned by the insurance carrier to represent Dr. Southwick. However, the same carrier which covered Dr. Southwick also insured the defendant, and Dr. Method was represented at Dr. Southwick's deposition by the firm originally assigned to represent Dr. Southwick.

Following denial of motions for directed verdicts by both parties, the jury returned a verdict for the defendant, and plaintiff appeals.

OPINION

Plaintiff raises five issues on appeal: (1) whether Dr. Southwick should have been barred from testifying because he violated his patient's physician-patient privilege; (2) whether the court erred in admitting Dr. Southwick's record of his meeting with his attorney and plaintiff's attorney; (3) whether the court erred in admitting the diagrams and notations made by defendant and his attorney at defendant's deposition; (4) whether defense counsel improperly utilized learned treatises in cross-examination of Dr. Everson, plaintiff's expert; and (5) whether the testimony of defendant's expert, Dr. Cunningham, was sufficient to create a triable issue of fact so as to support a verdict for the defendant.

Plaintiff argues that Dr. Southwick should have been barred from testifying because he violated Maria Baylaender's physician-patient privilege when he, without her consent and prior to any suit being filed, discussed her care with an attorney appointed by his insurance carrier to represent him. This violation was exacerbated, plaintiff contends, when, after suit was filed, the insurer assigned another attorney to represent Dr. Southwick, and Dr. Southwick's original attorney was assigned by the same insurance carrier to represent the defendant. In support, plaintiff relies on *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, which held that *ex parte* conferences between defense counsel and a plaintiff's treating physician were prohibited even after plaintiff filed suit for injury, given the underlying confidential and fidu-

cial considerations that must control the physician-patient relationship.

Defendant, on the other hand, contends that nothing in *Petrillo* suggests that a doctor does not have the right to consult with counsel when his medical records are requested by an attorney investigating the feasibility of filing a medical malpractice suit even though suit has not yet been filed. Defendant urges that to extend the proscription of *Petrillo* to communications between a doctor and his own attorney prior to being sued would seriously compromise his ability to prepare his defense in the event of suit ultimately being filed against him.

In *Petrillo*, the court relied on the strong public policy favoring the confidentiality of the physician-patient relationship, and held even after suit for injuries is filed against a third party, *ex parte* discussions between plaintiff's treating physicians who have themselves not been joined as defendants and defendant's attorney were to be prohibited. Such discussions were in violation of both the physician's duty of confidentiality and his fiduciary duty to his patient. These duties preclude the physician from disclosing confidential information about his patient to third parties without his patient's express authorization other than through court-authorized discovery means. *Petrillo*, 148 Ill. App. 3d at 593.

While under the statute governing the physician-patient privilege (Ill. Rev. Stat. 1989, ch. 110, par. 8—802) the filing of plaintiff's lawsuit constitutes implicit consent to disclosure by the plaintiff's doctors of previously privileged medical information, under *Petrillo* and its progeny such consent is implied only as to information transmitted through court-authorized discovery. (*Petrillo*, 148 Ill. App. 3d at 603; *Nastasi v. United Mine Workers of America Union Hospital* (1991), 209 Ill. App. 3d 830, 567 N.E.2d 1358; *Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 554 N.E.2d 266; *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 532 N.E.2d 327.) Whether these same concerns and limitations which apply to *ex parte* discussions between the plaintiff's nondefendant treating physicians and the defendant's attorney also prohibit a treating physician from consulting his own attorney prior to being joined as a defendant in plaintiff's action is the question which should bear our initial consideration.

Here, too, with respect to this question we must first look to the language of the statute governing the physician-patient privilege, which provides as follows:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve such patient, except only \*\*\* (2) in actions, civil or criminal, against the physician for malpractice, \*\*\* (4) in all actions brought by or against the patient, his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate wherein the patient's physical or mental condition is an issue \*\*\*." (Ill. Rev. Stat. 1989, ch. 110, par. 8—802.)

The statute speaks of exceptions in "actions, civil or criminal" and "actions brought by or against the patient," which if interpreted literally would seem to indicate that the exceptions are not applicable until a suit has been filed, at which time the patient impliedly consents to disclosure of relevant confidential information. (*Petrillo*, 148 Ill. App. 3d 581, 499 N.E.2d 952.) The question thus becomes whether there is an implied right of a physician to consult an attorney before being sued, notwithstanding the literal language of the statute, based upon an inherent right of the individual to have unfettered access to his or her own legal counsel to protect against any existent or potential legal risk. The fundamental value of facilitating access between a client and his attorney is expressed in the formulation and protection given to their communications under the attorney-client privilege. See generally 8 J. Wigmore, Evidence §2290 *et seq.* (McNaughton rev. ed. 1961) (modern view of attorney-client privilege based on desire to promote freedom of consultation with attorney); see also *People ex rel. Hopf v. Burger* (1975), 30 Ill. App. 3d 525, 332 N.E.2d 649 (attorney-client privilege grounded in policy favoring open communication between clients and attorneys, not dependent on pending litigation).

It may be argued that to permit such discussions before suit is filed could provide a loophole which could seriously erode the protections provided under *Petrillo*. Conceivably, a license to consult an attorney prior to suit being filed could provide a means to circumvent the impact of *Petrillo* by permitting a treating physician to consult with his own attorney and, of pragmatic necessity, his insurer, in purported anticipation of being made a party to a suit, with the result that his lawyer or carrier would then be able to share that information with defense counsel and other carriers on an informal basis.

However, the fear of such erosion is diluted by the fact that the treating physician has the means by which to control the sharing of

any information by his attorney, or for that matter his carrier, through enforcement of the attorney-client privilege. The lawyer would be bound by the attorney-client privilege not to disclose without his client's consent, and the physician would be bound by his fiduciary duty to his patient to withhold such consent. Likewise, statements made by a physician to his insurer are similarly protected by the attorney-client privilege. (*People v. Ryan* (1964), 30 Ill. 2d 456, 461, 197 N.E.2d 15 ("public policy dictates that the statement given by [the insured] to her insurance carrier was clothed with the attorney-client privilege while in control of the insurer"); *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146 (communications between insured and insurer fall within attorney-client privilege).) This long-established rule applies even if the statements are made to a nonattorney agent of the insurer when the insurer is under a duty to defend, due to the fact that the insured may assume that any communications made to the agent are for the purpose of being transmitted to an attorney. (*People v. Ryan*, 30 Ill. 2d 456, 197 N.E.2d 15; see also *Claxton v. Thackston* (1990), 201 Ill. App. 3d 232, 559 N.E.2d 82; *Chavez v. Watts*, 161 Ill. App. 3d 664, 515 N.E.2d 146; *Braglia v. Cephus* (1986), 146 Ill. App. 3d 241, 496 N.E.2d 1171.) Thus, the physician client may also control the disclosure of any information provided to his insurance carrier through the exercise of his attorney-client privilege.

We recognize that notwithstanding the availability of the attorney-client privilege to restrict unbridled sharing of the patient's medical secrets, an argument can nevertheless be made that once communication with third parties is permitted prior to suit, albeit with the physician's own attorney or insurer, it becomes difficult to monitor and control any further information sharing between such third parties and the defendant's attorney or insurance investigators.

The question of whether a physician may consult his own attorney prior to being sued was briefly discussed in two relatively recent law review articles written from the polar perspectives of the plaintiff and defense bars. From the defense side, in McVisk, *A More Balanced Approach to Ex Parte Interviews by Treating Physicians*, 20 Loy. U. Chi. L.J. 819 (1989), the author proposed, as does the defendant here, that *Petrillo* should not apply to a physician who fears that a malpractice suit may be filed against him. The rationale is that the physician's defense is enhanced if he is able to consult with an attorney while the events are still fresh in his mind. Moreover, McVisk argues, any breach of physician-patient

confidentiality which does occur will be limited by the attorney's ethical obligation to maintain the confidences of his client, the physician.

From the plaintiff's viewpoint, in Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient-Litigant's Right to a Fair Trial*, 21 Loy. U. Chi. L.J. 1001 (1990), the author takes the position that until suit is actually filed, a patient has not waived the privilege or consented to any disclosure of confidential information, and *Petrillo* should therefore apply. He responds to the need perceived by McVisk of the physician consulting an attorney while events are fresh by pointing to the physician's practice of recording important matters in his office records. As a result, the author concludes, there is no need to create an exception to *Petrillo* to allow disclosure prior to suit being filed.

▮ It would seem that notwithstanding the risks of possible abuse, neither the statute governing the physician-patient privilege nor the extension of the policies enunciated in *Petrillo* would seek to deny a physician the right to consult his counsel if in good faith he deems himself exposed to risk of suit which could be lessened by early legal consultation. In exercising his right to maintain such consultation with his attorney, the physician would be mandated by his fiducial duties to his patient to strictly enjoin his attorney and his carrier from any cross-communication or information sharing with anyone else pursuant to the control which he may assert under the attorney-client privilege which would be operative between him, his counsel and his insurer. While such practice is not without risk that there would be some erosions of the protections provided under *Petrillo*, it is counterbalanced by the fundamental right of any person, including a physician, to seek legal counsel when threatened by potential legal liability without having to wait until suit is filed. However, the resolution of this initial question is not dispositive of the unique issues presented in this case.

▮ Here, both the treating physician, Dr. Southwick, and defendant Dr. Method are insured by the same carrier, which in turn assigned the same attorney to represent the defendant after he had first been assigned to represent Dr. Southwick with whom he fully consulted in his capacity as Dr. Southwick's attorney. It was therefore impossible for Dr. Southwick to effectively exercise his attorney-client privilege to prevent either his attorney or his insurer from disclosing Maria Baylaender's confidences to defendant's attorney since they were one and the same. In transferring Dr. Southwick's attorney to represent the defendant, the insurer made

it impossible to build a "Chinese wall" between attorneys to prevent information sharing. While such separation is difficult even with two attorneys where the carrier is the same, it is absolutely impossible where the same attorney is engaged to represent the defendant after having represented the treating physician. Thus, even if the treating physician was not in violation of *Petrillo* in his initial consultation with his attorney even though he was not made a party to the lawsuit, he would be in clear violation in failing to enjoin his attorney from transmitting the knowledge learned from him to the defendant or otherwise using such knowledge to assist the defense, which would be inevitable where his attorney assumes the defendant's representation.

A case can be made that the integrity of the physician-patient relationship as defined in *Petrillo* could still have been maintained notwithstanding the fact that the same carrier which insured the defendant also insured the treating physician, had the carrier simply retained a different firm to represent the defendant and taken appropriate measures to ensure that the treating physician's confidences were not shared. See, *e.g., Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335 (when conflict exists between insured and insurer, same attorney cannot ethically represent both); *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24 (conflict of interest between insured and insurer required insurer with duty to defend to reimburse insured for costs of independent defense).

Here, exactly the opposite occurred. The carrier assigned an attorney to represent Dr. Southwick, and when suit was actually filed and Dr. Method rather than Dr. Southwick was named as defendant, deliberately took that attorney from Dr. Southwick, along with any confidential information Dr. Southwick may have revealed to him, assigned other counsel from another firm to represent Dr. Southwick, and assigned the original attorney to represent Dr. Method. In effecting this transfer, the plaintiff's rights under *Petrillo* to protect her medical secrets learned by her physician from disclosure to the defendant were fatally compromised.

Accordingly, we hold that the *ex parte* discussions which occurred here between plaintiff's treating physician and an attorney who later became the attorney for the defendant physician were in violation of the policies enunciated in *Petrillo*.

Defendant would urge that any sanction for violating *Petrillo* should be applied only to violations which occurred after 1986, and since the discussions at issue here occurred in 1979, no sanctions

should be imposed. *Petrillo,* however, has been held not to be new law and has been applied retroactively. (See *Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1376 (although *Petrillo* was case of first impression, it did not change existing law); *Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 513 N.E.2d 519; but see *Roberson v. Liu* (1990), 198 Ill. App. 3d 332, 555 N.E.2d 999 (which held that *Petrillo* was applicable, but vacated a finding of contempt for conduct which occurred before *Petrillo*).) Moreover, the issues raised in *Petrillo* were already of substantial currency in many jurisdictions in the late 1970's when this case arose. See, *e.g.,* *Hammonds v. Aetna Casualty & Surety Co.* (N.D. Ohio 1965), 243 F. Supp. 793; *Horne v. Patton* (1973), 291 Ala. 701, 287 So. 2d 824; *Wenninger v. Muesing* (1976), 307 Minn. 405, 240 N.W.2d 333; *Doe v. Roe* (1977), 92 Misc. 2d 551, 400 N.Y.S.2d 668.

■ Having determined that *ex parte* discussions by a treating physician with an attorney who ultimately represents the defendant in a medical malpractice action are in violation of the principles set forth in *Petrillo,* we turn our attention to the appropriate remedy. The only feasible remedy in this case is to bar Dr. Southwick from testifying for the defendant as a sanction for violating Maria Baylaender's physician-patient privilege. On balance, we find such a sanction appropriate to countervail the prejudice to the plaintiff resulting from the breach of the fiducial and confidential relation between Dr. Southwick and the plaintiff which was precipitated in this case. The propriety of this remedy where the principles of *Petrillo* were violated has been repeatedly affirmed. See *Mondelli v. Checker Taxi Co.,* 197 Ill. App. 3d 258, 554 N.E.2d 266; *Ritter v. Rush-Presbyterian-St. Luke's Medical Center,* 177 Ill. App. 3d 313, 532 N.E.2d 327; *Yates v. El-Diery,* 160 Ill. App. 3d 198, 513 N.E.2d 519; *Karsten v. McCray,* 157 Ill. App. 3d 1, 509 N.E.2d 1376.

As we have determined that this matter must be reversed and remanded for a new trial due to the violation of *Petrillo,* we need not determine whether the admission of certain evidence which plaintiff claims was error would also warrant reversal. However, we do reject plaintiff's contention that no triable issues of fact existed and that he was entitled to judgment notwithstanding the verdict.

Plaintiff contends that the "controversy comes down to whether or not there was *any* evidence from which the jury could conclude that the new mass in the upper outer quadrant was *not* present in December of 1977 or May of 1978." It is plaintiff's position that there was no factual basis for Dr. Cunningham's opinion that the

mass did not exist, and it must therefore be excluded, and that when Dr. Cunningham's testimony and the testimony of Dr. Southwick are excluded, there is no disputed issue of fact as to the existence of the mass in Maria Baylaender's left breast in December of 1977 or May of 1978. We disagree.

■ Regarding Dr. Cunningham, he testified that his opinion that there was no mass was based in part on the diagrams drawn by the defendant during his deposition, and that he does not ordinarily rely on such material in forming opinions. Although we do not necessarily consider these diagrams to be inadmissible, as plaintiff would have us do (see, *e.g., Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 498 N.E.2d 682 (it was not an abuse of discretion to admit hand-drawn diagram of the accident site, since the diagram assisted the eyewitnesses in their testimony and clarified the events for the jury; diagram was admissible even though it contained a discrepancy concerning the length of defendant's skid marks, since that discrepancy was brought to the jury's attention)), we need not dispose of that issue here since even had we found the diagrams inadmissible, there would still have been a factual basis for Dr. Cunningham's opinion.

In addition to the diagrams, he also reviewed the defendant's office records and his letter to Dr. Gerbie. Neither the records nor the letter indicated that the mass was present. Dr. Cunningham also reviewed the discovery and evidence depositions of the defendant, in which the defendant testified that he did not palpate a hard mass. Dr. Cunningham also reviewed the medical records of Drs. Gerbie and Southwick, the records from Presbyterian-St. Luke's Hospital and the mammograms. The records of neither Dr. Gerbie nor Southwick indicated the presence of the type of hard mass which plaintiff contends was present. In addition, the mammograms were negative. Thus, there was a factual basis for Dr. Cunningham's opinion that no mass existed, even if the diagrams were excluded.

Moreover, in addition to Dr. Cunningham's opinion, Dr. Method testified in his evidence deposition that he did not palpate a mass in the upper outer quadrant of Maria Baylaender's left breast during either examination. While plaintiff contends that the defendant's failure to document the lack of such a finding is "negative evidence" which is insufficient to create a factual issue in light of the positive testimony of plaintiff and Maria Baylaender, we cannot agree. Dr. Method testified that it was not his practice to document negative findings. Dr. Gerbie testified to the same effect. As a

result, it would be permissible to infer from the lack of any entry in the defendant's records that no such mass existed. Thus, there was other evidence, additional to Dr. Cunningham's opinion, from which the jury could conclude that the mass was not present.

In addition, there was conflicting testimony on the issue of proximate cause. Dr. Everson testified that defendant's failure to diagnose the cancer in December 1977 significantly decreased Maria Baylaender's chance of survival. Dr. Cunningham, however, testified that even had the defendant detected and treated the cancer in December, she had no chance of survival, and therefore defendant's failure to diagnose the cancer did not cause her death.

Thus, as a result our review of the record, we must disagree with the plaintiff that there were no triable issues of fact so as to entitle him to a judgment notwithstanding the verdict. See *Mangus v. Cock Robin Ice Cream Co.* (1977), 52 Ill. App. 3d 110, 367 N.E.2d 203 (in passing on motion for judgment notwithstanding verdict, both reviewing and trial courts are governed by same rules, that is, whether, when all the evidence is viewed in the aspect most favorable to the nonmovant, any contrary verdict could stand).

For all the above reasons, the judgment in favor of defendant is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

McNULTY, P.J., and MURRAY, J., concur.