HELEN RITTER *et al.*, Co-Ex'rs of the Estate of Lois Buttles, Deceased, Plaintiffs-Appellees and Cross-Appellants, v. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, Defendant-Appellant and Cross-Appellee.

First District (3rd Division)   Nos. 88—0187, 88—0845 cons.

Opinion filed December 7, 1988.

314

Arnstein, Gluck, Lehr & Milligan, of Chicago (Arthur L. Klein, John L. Ropiequet, and C. Vincent Maloney, of counsel), for appellant.

Fitzgerald & Gottlick, of Hinsdale (Joseph E. Fitzgerald, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Lois Buttles, filed this action in the circuit court of Cook County for personal injuries sustained when she fell off of a transport cart, or gurnee, while a patient at defendant, Rush-Presbyterian-St. Luke's Medical Center (Rush). After trial, a jury returned a verdict for Buttles in the amount of $332,998.15. Rush appeals an order finding it in contempt of court for violating a pretrial discovery order, the judgment for plaintiff and the denial of its post-trial motions. Cross-appellants, Helen Ritter and the Beverly Trust Company, the co-executors of Buttles' estate, Buttles having died shortly after trial, appeal the denial of a fine against Rush pursuant to the contempt finding.

Plaintiff was admitted to Rush for treatment of a bleeding ulcer on July 7, 1986. She was 81 years old at the time. She was initially treated by her internist, Dr. Paul Winter. Because of a substantial loss of blood since July 7, Dr. David Roseman operated on plaintiff to close the ulcer on July 9. After the operation, post-operative problems kept plaintiff in intensive care until July 30. Thereafter, plaintiff was transferred out of intensive care to a general surgical floor for further post-operative recovery. On August 5, plaintiff was taken to the radiology department for C.T. scans of her abdomen. Upon her arrival at the radiology department, a C.T. technician removed her restraints, lowered the rails of her gurnee and left her unattended. Plaintiff fell from the gurnee while unattended, fracturing the facial bone under her left eye and bruising her face. She was found and examined by the radiology resident, Dr. Cheryl Walczak. Dr. Walczak called the surgical resident on plaintiff's floor, who also examined her. Plaintiff was

examined on August 6 by Dr. Donna Bergan, a neurologist, and on August 7 by Dr. Kelvin Von Roenn, a neurosurgeon. After plaintiff suffered a seizure on August 22, she was diagnosed as suffering from a subdural hematoma. Dr. Von Roenn operated to relieve the hematoma that day. Plaintiff was transferred to Rush's rehabilitation wing on September 5. Her diagnosis upon admission to the wing was "subdural hematoma." Plaintiff was discharged home on October 15.

Plaintiff filed suit against Rush on November 14, 1986. In preparing for trial, Rush's risk manager interviewed four physicians who had treated plaintiff at Rush. They were: (1) Dr. Jo Lynn Polk, the attending physiatrist who supervised plaintiff's rehabilitation; (2) Dr. Nina Paleologos, the neurology resident on call when plaintiff fell on August 5 and suffered the seizure on August 22; (3) Dr. Bergan, who, in addition to examining plaintiff on August 6, was consulted by Dr. Paleologos regarding plaintiff; and (4) Dr. Antonio Yuk, a neurosurgery resident who also examined plaintiff on August 6 and who was consulted for follow-up care after her seizure. Rush disclosed these interviews to plaintiff through discovery in July 1987. Plaintiff then moved to bar any further communication between Rush and plaintiff's treating physicians, including Rush's employees. The trial court granted the motion on September 9, 1987. Thereafter, the trial court essentially denied Rush's motion to reconsider the September 9 order.

Rush sought leave to appeal the September 9 order but its application was dismissed as moot after the cause was assigned for trial on December 14. When Rush's motions to stay or continue the trial were denied, defense counsel interviewed Drs. Polk, Kluiber, Paleologos, Bergan and Yuk to prepare for trial. Plaintiff moved for sanctions at the start of trial. The trial court found Rush in contempt, assessed attorney fees of $1,050 and costs of $164 against it and barred it from calling the five physicians as witnesses.

■■ In its appeal, Rush contends, in the main, that the trial court erred in prohibiting it from communicating with and calling as witnesses in its behalf plaintiff's treating physicians since they were also Rush's staff physicians. Specifically, Rush asserts that the trial court erred in extending *Petrillo v. Snytex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232, to the circumstances of this case. *Petrillo* held that *ex parte* conferences between defense counsel and a plaintiff's treating physician are prohibited as against Illinois public policy because they jeopardize the sanctity of the confidential and fiducial physician-patient relationship. (*Petrillo*, 148 Ill. App. 3d at 588.) Rush asserts that *Petrillo* does not apply to this case for several reasons.

■ Rush first asserts that application of *Petrillo* to the facts of this case will defeat the purpose of the physician-patient privilege by impeding the effective delivery of health care. We cannot agree. In so arguing, Rush gives too broad a compass to the "continuing dialogue" between a hospital and its medical staff which it claims such application would prohibit. The physician-patient privilege protects the confidentiality of information from a patient necessary to enable a physician to serve the patient. (Ill. Rev. Stat. 1985, ch. 110, par. 8—802.) As such, we simply will not equate the communication of such information amongst a hospital's medical personnel for purposes of treating a patient with its communication by such personnel to the hospital's attorneys for purposes of defending a lawsuit brought by the patient. In short, we believe that, contrary to Rush's assertion, application of *Petrillo* here will encourage rather then discourage a continuing dialogue between *patients* and their *physicians*. Conversely, a holding that *Petrillo* does not apply would, we believe, greatly discourage unconstrained communication between a patient being treated at a hospital or clinic and the physicians actually treating him.

We also cannot equate communication between a hospital and its medical staff, pursuant to their legal duty under the Hospital Licensing Act (Ill. Rev. Stat. 1985, ch. 111½, par. 142 *et seq.*) to ensure the quality of the hospital's medical care, with communication of a patient's confidential information by staff physicians to a hospital's attorneys for purposes of defending a lawsuit by the patient. Similarly, we do not believe, contrary to Rush's reliance thereon, that any agency principles applicable to the relationship between a hospital and an . employee-physician outweigh the public policy considerations underlying the physician-patient privilege. Thus, agency principles cannot abrogate the physician-patient privilege.

There is another reason why we do not believe that the legal duty of Rush and its medical staff to ensure that Rush provides quality medical care warrants Rush's inclusion within the physician-patient privilege. Rush's argument in this regard ignores that this case involves only the alleged negligence of a nonphysician-employee of a hospital. As such, any justification to extend the physician-patient privilege to Rush, were plaintiff's lawsuit based on the alleged negligence or malpractice of a physician-employee, is absent here.

When a patient seeks to hold a hospital vicariously liable for the negligence or malpractice of an employee-physician, exclusion of the hospital from the physician-patient privilege would, we believe, and as Rush argues, effectively prevent the hospital from defending itself by barring communication with the physician for whose conduct the hos-

pital is allegedly liable. In contrast to such a case, Rush's exclusion from the physician-patient privilege in this case would not bar it from communicating with the employee allegedly responsible for plaintiff's injuries and thus would not bar it from defending itself from liability. That Rush only contested plaintiff's damages in this case is, we believe, insufficient justification to include Rush within the physician-patient privilege. In such circumstances, Rush is merely seeking to minimize its liability to plaintiff. It is not seeking to provide effective medical care or to defend itself from liability to a patient for improper medical care.

Moreover, *Parkson v. Central Du Page Hospital* (1980), 105 Ill. App. 3d 850, 435 N.E.2d 140, does not require the conclusion that the type of disclosure sought from plaintiff's treating physicians by Rush is within, rather than without, the physician-patient privilege. *Parkson* held that a hospital could assert the privilege to bar the discovery of the medical records of patients who, along with the plaintiffs, were treated at the hospital but were not parties to the plaintiffs' lawsuit. We do not believe that *Parkson*, which, unlike *Petrillo*, involved a totally inapposite fact pattern, can be extended to apply here.

■ Rush also asserts that it was entitled to learn confidential information given by plaintiff to her treating physicians because, by disclosing such information for the purpose of treatment by Rush through those physicians, plaintiff either evidenced an expectation that the information would not be kept from Rush or waived the physician-patient privilege. We cannot agree. In this regard, *Petrillo* stated:

> "[W]e note that when a patient files suit, he implicitly consents to his physician releasing any of the medical information related to the mental or physical condition *** placed at issue in the lawsuit ***.
>
> The patient's implicit consent, however, is obviously and necessarily limited; he consents only to the release of his medical information (relative to the lawsuit) *pursuant to the methods of discovery authorized by Supreme Court Rule 201(a)* (87 Ill. 2d R. 201(a)). A patient certainly does not, by simply filing suit, consent to his physician discussing that patient's medical confidences with third parties outside court-authorized discovery methods, nor does he consent to his physician discussing the patient's confidences in an *ex parte* conference with the patient's legal adversary." (Emphasis in original.) *Petrillo*, 148 Ill. App. 3d at 591.

■ Rush next argues that, if *Petrillo* applies here and if plaintiff did not waive her physician-patient privilege, *Petrillo* should be "reconsidered" because it violates the right of tort defendants to effectively prepare a defense and present it at trial. The physician-patient privilege is codified in section 8—802 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 8—802). One of the nine exceptions to the privilege allows the disclosure of information acquired from a patient "in all actions *** wherein the patient's physical or mental condition is an issue." (Ill. Rev. Stat. 1985, ch. 110, par. 8—802(4).) In view of that exception, Rush asserts that the *Petrillo* holding is unnecessary to preserve patients' confidence in their physicians because the information learned through informal interviews between defense counsel and a plaintiff's treating physician's will not remain confidential, in any event.

We cannot agree with Rush that the method by which a legal adversary learns a patient's otherwise confidential information from a treating physician is immaterial since, having filed suit, the patient knows the information will not remain confidential anyway. In so arguing, Rush ignores the protection afforded the confidentiality of information told a physician by formal discovery methods. It is this protection, rather than the mere fact that a patient has filed suit, which justifies the disclosure of otherwise confidential information told a physician once a patient has filed a suit putting his mental or physical condition at issue. (*Petrillo*, 148 Ill. App. 3d at 590-93.) Otherwise stated, it is the lack of protection to the confidentiality of information told a physician when he engages in *ex parte* communications with his patient's legal adversary which warrants the prohibition of its disclosure through such means. As the protection afforded a patient's confidential information by formal discovery procedures is the paramount consideration, we disagree that the physician-patient privilege does not bar *ex parte* communications between a physician and his patient's legal adversary simply because the patient filed a lawsuit putting his mental or physical condition at issue.

Rush also attacks the *Petrillo* court's reliance on the fiducial nature of the physician-patient privilege (see, *e.g.*, *State ex rel. Stufflebam v. Appelquist* (Mo. App. 1985), 694 S.W.2d 882; *Foshee v. Krum* (1952), 332 Mich. 636, 52 N.W.2d 358; *Estate of Leach v. Shapiro* (1984), 13 Ohio App. 3d 393, 469 N.E.2d 1047) as also prohibiting *ex parte* communications between physicians and their patients' legal adversary as against public policy. (*Petrillo*, 148 Ill. App. 3d at 593-96.) Rush asserts that the *Appelquist* case, as well as the States of Michigan (*Gailitis v. Bassett* (1966), 5 Mich. App. 382, 146 N.W.2d

708) and Ohio (*Covington v. Sawyer* (1983), 9 Ohio App. 3d 40, 458 N.E.2d 465), permit *ex parte* communications between a plaintiff's treating physician and his legal adversary, notwithstanding their recognition, as noted in *Petrillo*, of a fiduciary relationship between patient and physician.

The fact that other jurisdictions allow *ex parte* communications between a treating physician and his patient's legal adversary, notwithstanding their recognition of a physician's fiduciary duties to his patient, does not, alone, convince us that the *Petrillo* court was wrong in holding to the contrary. There is a sufficiently even split of authority on this issue (see *State ex rel. Stufflebam v. Appelquist* (Mo. App. 1985), 694 S.W.2d 882, 887; Annot., 50 A.L.R.4th 714 (1986)) to make the *Petrillo* court's conclusion not manifestly erroneous.

■ Moreover, contrary to Rush's assertion, the *Petrillo* court did cite authority for its holding that the fiduciary relationship between a patient and physician gives the patient the right to expect that his physician will provide medical information sought by the patient's adversary only through court-authorized methods of discovery. *Petrillo*, 148 Ill. App. 3d at 595, citing *Miles v. Farrell* (N.D. Ill. 1982), 549 F. Supp. 82, *Alexander v. Knight* (1962), 197 Pa. Super. 79, 177 A.2d 142.

■ As Rush notes, *Petrillo* did recognize that a party does not have a proprietary right to any witness' testimony. However, the *Petrillo* court rejected this argument as a basis on which to allow *ex parte* interviews between defense counsel and treating physicians. (*Petrillo*, 148 Ill. App. 3d at 600-01.) Rush makes no argument compelling us to disagree with *Petrillo* in this regard. Contrary to Rush's assertion, the *Petrillo* court did not ignore that attorneys generally have the right to interview witnesses to learn what testimony they will give. Rather, it specifically rejected that right as a basis for allowing *ex parte* interviews of a plaintiff's treating physician. (*Petrillo*, 148 Ill. App. 3d at 602.) Once again, Rush makes no argument convincing us to disagree with this aspect of *Petrillo*.

■ Rush also argues that *ex parte* interviews save the time, expense, and delay involved in deposing usually reluctant physicians. However, *Petrillo* also disposed of this argument by holding that neither the time nor expense involved in deposing a treating physician "creates such hardship that it is necessary for us to carve an exception into the well-established rules of discovery." *Petrillo*, 148 Ill. App. 3d at 597.

We also reject Rush's assertion that the physician-patient privilege is inapplicable to information given or statements made by plaintiff to

physicians of whose name or presence she was unaware. The privilege applies "where a physician attends a person for the purpose of giving professional aid even though the person attended is unconscious or unaware of his presence." (97 C.J.S. *Witnesses* §294(e) (1957), citing *Jones v. Jones* (1955), 208 Misc. 721, 144 N.Y.S.2d 820, 826.) If the privilege attaches even where a patient is unaware of a physician's presence, it is also immaterial to its attachment that plaintiff may not have known the names of all the doctors who attended her at Rush.

We also find unavailing Rush's attack upon *Petrillo* on the ground that the court improperly assumed that physicians would violate their ethical obligation of not revealing a patient's confidential information in *ex parte* interviews with defense counsel. (*Petrillo*, 148 Ill. App. 3d at 594-95.) Contrary to Rush's implication, the *Petrillo* court did not solely rely on that assumption in reaching its decision. It also relied on the threat from the patient's perspective to the atmosphere of trust, loyalty and faith inherent in the physician-patient relationship posed by such interviews regardless of what might be revealed therein. (*Petrillo*, 148 Ill. App. 3d at 595-96.) For this reason also, we find immaterial the existence of safeguards against an attorney's use of confidential and irrelevant information learned in witness interviews (see 107 Ill. 2d R. 219(c); D.R. 7—102(a)(1)).

■ Rush next contends the trial court erred in barring evidence of plaintiff's contacts with her attorney during her stay at Rush. Rush contends this evidence revealed an alert mental condition at odds with the confused and delusional state of mind which allegedly resulted from plaintiff's fall. Specifically, Rush asserts that evidence that plaintiff had decided to sue it and that she began to consult with her attorney while undergoing rehabilitation treatment at Rush could have provided an explanation other than her mental condition for plaintiff's noncooperation with her therapists.

We agree with plaintiff that there was sufficient other evidence adduced by Rush of plaintiff's alert and lucid state of mind to render the evidence of plaintiff's intent to sue the hospital and of her visits with her attorney more prejudicial than probative. (See *Hulsebus v. Russian* (1969), 118 Ill. App. 2d 174, 180-81, 254 N.E.2d 184.) As such, the trial court did not abuse its discretion in excluding that evidence.

Cross-appellants contest the denial of a fine against Rush for violating the order prohibiting it from interviewing plaintiff's treating physicians. In brief, cross-appellants contend that Rush's conduct caused Dr. Polk, who supervised plaintiff's rehabilitation, to assert that that treatment was necessitated by a "deconditioning" problem rather than her fall, which she had maintained prior to her interview

with defense counsel. Because plaintiff then decided not to call Dr. Polk as a witness, cross-appellants reason that Rush's conduct denied plaintiff an element of her damages, *viz.*, the bill for rehabilitation treatment after her fall or $27,718.54.

Cross-appellants thus request a fine of $27,718.54 against Rush. That fine, they assert, would be proportionate to the gravity of Rush's violation of the discovery order (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 51; *Transamerica Insurance Group v. Lee* (1987), 164 Ill. App. 3d 945, 518 N.E.2d 413; *In re Estate of Soderholm* (1984), 127 Ill. App. 3d 871, 469 N.E.2d 410) and would keep it from considering such violations in a cost-effective manner (*Lee,* 164 Ill. App. 3d 945, 518 N.E.2d 413; *Soderholm,* 127 Ill. App. 3d 871, 469 N.E.2d 410). Cross-appellants also request an *additur* of the $27,718.54 in damages which Rush's violation allegedly cost plaintiff.

■ We agree with cross-appellants that Rush's conduct was fundamentally more egregious than that in *Petrillo* inasmuch as Rush did not, unlike defense counsel in *Petrillo,* inform the trial court that it intended to violate the order prohibiting *ex parte* communication with plaintiff's treating physicians. However, neither *Buehler, Soderholm* nor *Lee* supports the imposition of the large fine requested by cross-appellants. More importantly, the imposition of sanctions for failure to comply with discovery rules and orders is within the discretion of the trial court and cannot be disturbed absent an abuse of that discretion. (*Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 473 N.E.2d 444.) As a sanction for its violation of the subject order, the trial court barred Rush from calling plaintiff's treating physicians as witnesses in its case in chief and awarded plaintiff attorney fees of $1,050 and $164 in court costs. These sanctions are expressly included among those allowed under Supreme Court Rule 219(c). (107 Ill. 2d R. 219(c).) As such, we do not believe that the failure to impose a monetary fine against Rush was an abuse of discretion.

■ Nor do we believe that cross-appellants are entitled to the *additur* requested. Although it is more akin to criminal contempt, a contempt of court finding for violation of discovery rules or orders may be classified as a civil contempt. (See *Anderson v. St. Mary's Hospital* (1981), 101 Ill. App. 3d 596, 598, 428 N.E.2d 528.) In a civil contempt proceeding in Illinois, the court may imprison or fine for contempt of its orders but is without authority to recompense the aggrieved party for his damages. (*In re Marriage of Wilde* (1986), 141 Ill. App. 3d 464, 473, 490 N.E.2d 95; *Melbourne Corp. v. City of Chicago* (1979), 76 Ill. App. 3d 595, 612, 394 N.E.2d 1291; *Eberle v. Greene* (1966), 71 Ill. App. 2d 85, 93, 217 N.E.2d 6.) As such, we can-

not award plaintiff an element of her damages as a penalty against Rush for its violation of the subject discovery order.

For all of the foregoing reasons, the judgment for plaintiff, the denial of defendant's post-trial motions, the finding of contempt against defendant and the denial of a fine against defendant are affirmed in their entirety.

Affirmed.

WHITE, P.J., and RIZZI, J., concur.