ROBERT MORGAN, Plaintiff-Appellee, v. THE COUNTY OF COOK *et al.*, Defendants-Appellants.

First District (1st Division) No. 1—91—3636

Opinion filed August 23, 1993.

Jack O'Malley, State's Attorney, of Chicago (Karen A. Covy and John A. Ouska, Assistant State's Attorneys, of counsel), for appellants.

Bernard R. Nevoral & Associates, Ltd., of Chicago (David L. Cwik, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Robert Morgan (plaintiff) brought a medical malpractice action against the County of Cook (Cook County) and Dr. Donald H. Vliengenthart to recover damages for injuries he allegedly sustained as a result of improper medical treatment he received while a patient at Cook County Hospital. At trial, the judge granted plaintiff's motion to bar defendants from calling Vliengenthart's supervisor, Dr. Robert Hall, to testify on the grounds that defendants engaged in improper *ex parte* conferences with a treating physician in violation of *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952. At the close of trial, the jury returned a verdict in favor of plaintiff and against defendants in the amount of $180,000. The verdict was entered and defendants filed a motion for a new trial which was denied. On appeal, defendants contend that: (1) the trial judge improperly barred the testimony of Dr. Hall as violative of the *Petrillo* rule; and (2) plaintiff's motion to bar Dr. Hall was untimely filed and should not have been considered by the trial judge.

On his way home from a New Year's Eve party, plaintiff was involved in an accident in which he broke his right leg above the knee, thus suffering a fractured right femur. He was first taken to Loretto Hospital and then transferred to Cook County Hospital. Plaintiff remained at Cook County Hospital for 21 days. His treating physicians were Dr. Vliengenthart, the senior orthopedic resident, and Dr. Sam Tacke, his junior resident. Dr. Hall was the staff attending physician and acting chief of orthopedic surgery.

On August 14, 1985, plaintiff filed a complaint against Cook County and Cook County Hospital alleging that his leg healed improperly due to incorrect medical treatment. On December 30, 1985, plain-

tiff filed an amended complaint. On December 31, 1986, plaintiff filed a second-amended complaint adding six other doctors as defendants, including Drs. Vliengenthart, Hall, and Tacke. On January 15, 1987, the summons was returned without service on Dr. Hall. An alias summons, issued June 4, 1987, was also returned without service on Dr. Hall on June 16, 1987. On June 12, 1987, a third-amended complaint was filed. An appearance was filed on behalf of Dr. Vliengenthart on July 1, 1988. Plaintiff filed a fourth-amended complaint on January 18, 1989, and a fifth-amended complaint on March 21, 1989. These final amended complaints again named Drs. Vliengenthart, Hall, and Tacke as defendants along with several other doctors, Cook County, and Cook County Hospital.

By the first day of trial, on August 1, 1991, the only doctor named as a defendant whom plaintiff had successfully served process on was Dr. Vliengenthart. Therefore, without objection, plaintiff filed a sixth-amended complaint eliminating all defendants, including Dr. Hall, who had not been successfully served and proceeded only against Cook County and Dr. Vliengenthart.

On Friday, August 2, 1991, the parties presented their opening statements. Plaintiff's counsel told the jury that it would hear from Dr. Vliengenthart and "one or two other doctors who are on staff at [Cook County] hospital." Defense counsel informed the jury that Dr. Hall would testify. Later that day, during the luncheon recess, various motions *in limine* were placed in the record and defense counsel told the court that Dr. Hall was scheduled to testify on Tuesday, August 6, 1991. On Monday, August 5, 1991, plaintiff's counsel made a motion to bar Dr. Hall's testimony on the grounds that he was one of plaintiff's treating physicians and, therefore, defense counsel had engaged in improper *ex parte* conferences with him in violation of the *Petrillo* doctrine. After argument on the motion, the trial judge granted plaintiff's motion.

At trial, plaintiff testified that he was shown the X ray of his leg and told that the only way to repair the fracture was with surgery "to have a rod put in there." He stated that he agreed to undergo surgery the next day and signed the consent forms. The forms indicated that the surgery would be performed by Dr. Hall or Dr. Vliengenthart. The surgery planned for January 2, 1984, however, was cancelled. According to plaintiff, Vliengenthart told him that his surgery was cancelled because the "rod" had not arrived yet from Europe. He testified that on January 6, 1984, he was informed by a nurse that his surgery had been rescheduled for Monday, January 9. He stated that on January 9 his surgery was cancelled again and a

doctor informed him that they "were going to try to get me in the next day." He asserted that, on January 10, 1984, however, the surgery was again cancelled. He testified that, on January 11, he asked a doctor why his surgery kept getting cancelled and, for the first time, the doctor mentioned "traction."

According to plaintiff, after January 10 or 11, no doctor or nurse ever mentioned that he was going to be scheduled for surgery again. He stated that at no time during his hospitalization did he refuse to undergo surgery or withdraw his consent to the surgery. He testified that on January 11, 1984, a doctor told him that "he had discussed it with Dr. Hall [and] that they figured that traction would be the best for me." Plaintiff said that he told the doctor that he did not want traction, but would rather undergo the surgery for which he had previously given his consent. He stated that, on January 12, he again refused traction and expressed his desire to undergo surgery. According to plaintiff, he was told that there would be no surgery and that Dr. Hall had determined that traction was the "best" treatment. He testified that he was never given a consent form to sign to authorize the traction nor was he informed of the possible risks and complications of not having traction.

Plaintiff testified that, after he refused traction, the doctors said they would have to discuss the situation with Dr. Hall again. He stated that the next day the doctors told him that as an alternative to traction, they could put him in a body cast. He accepted the cast as alternative treatment, but reiterated that he would rather have had surgery. Plaintiff's leg from the end of his toes up to his waist was placed in a cast and he was released from the hospital on January 21, 1984.

Two weeks after he left the hospital, the cast was removed. Plaintiff testified that since his discharge from Cook County Hospital, he has suffered a bone spur, limited and painful movement, and a shortening of his right leg.

Dr. Vliengenthart testified that, as acting chief of orthopedic surgery at Cook County Hospital, Dr. Hall was his supervisor and responsible for the ultimate decisions that were made regarding a patient's care. He stated that he was not working January 1, 1984, when plaintiff was admitted. He testified that Dr. Tacke performed the history and physical on plaintiff when he was admitted. According to Vliengenthart, he was first informed of plaintiff's situation on Monday morning, January 2, 1984, when he, Dr. Hall, and Dr. Tacke reviewed his case at a staffing conference. Dr. Vliengenthart testified that Dr. Tacke informed him that although plaintiff had signed a sur-

gery consent form, plaintiff was now reluctant to proceed with surgery. Dr. Vliengenthart stated that Dr. Tacke also indicated to him that when plaintiff was admitted and signed the consent form, it appeared he had been drinking. He testified that he was "somewhat concerned," therefore, that plaintiff's consent to surgery may have been obtained while his judgment was impaired.

Dr. Vliengenthart said that when he did speak to plaintiff on January 2, 1984, plaintiff refused to proceed with surgery. Plaintiff had had surgery on his right leg several months earlier in September 1983 and, according to Dr. Vliengenthart, plaintiff expressed some fear about going ahead with the surgery. He testified that plaintiff told him that "he didn't want no more surgery." According to Vliengenthart, "the method of choice" to correct plaintiff's fracture was surgery and that plaintiff's particular condition "was an excellent case for [surgery]." He asserted that surgery was "the thing we all wanted to do—and we were desperately trying to talk him into it."

Dr. Vliengenthart testified that, prior to January 7, 1984, plaintiff was not scheduled for surgery because "[w]e really didn't have a consent by this time." He stated that on January 8, 1984, plaintiff gave his verbal consent, and he was scheduled for surgery the next day. According to Dr. Vliengenthart, he cancelled the surgery for plaintiff on January 9, 1984, because plaintiff was fearful about the operation. He testified that plaintiff's surgery, which was rescheduled for January 10, 1984, was again postponed, this time due to the unavailability of an operating room.

He stated that on January 12, 1984, plaintiff was very upset. According to a note written on January 12, which Dr. Vliengenthart read on the witness stand, plaintiff refused further treatment and expressed his desire to be casted and released. Dr. Vliengenthart testified that he told plaintiff that simply putting him in a cast was inadequate treatment and "would leave him with a shortened leg." He stated that he then discussed traction with plaintiff as an alternative treatment, but that plaintiff said "he didn't want any of that." He testified that plaintiff never again requested surgery and he was released on January 20, 1984. According to Dr. Vliengenthart, the shortening of plaintiff's leg and the other problems he was experiencing were the result of his refusing surgery. He asserted that, if plaintiff had gone ahead with the surgery, he would not have the problems he is experiencing.

Defendants' first contention on appeal is that the trial court improperly barred the testimony of Dr. Hall on the grounds that defense counsel held improper *ex parte* conferences with him in violation of

the *Petrillo* doctrine. Defendants argue that, where a patient seeks to hold a hospital vicariously liable for the negligence or malpractice of a physician-employee, the hospital should not be barred from privately communicating with the physician for whose conduct it is allegedly liable. Plaintiff, on the other hand, asserts that *Petrillo* must be strictly applied to prohibit all *ex parte* communications between defense counsel and a plaintiff's treating physician when the same information can be obtained through formal discovery. Plaintiff contends that this is the only way to protect the sanctity of the physician-patient relationship. We agree with defendant and hold that, when a patient seeks to hold a hospital vicariously liable for the conduct of a physician-employee, the hospital is entitled to speak *ex parte* with that physician.

In *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 584, 499 N.E.2d 952, 954, defense counsel in a products liability action engaged in *ex parte* conferences with plaintiffs' treating physicians. The Illinois Appellate Court held that "principles of public policy, obligations created by confidential and fiduciary relationships, and the ethical responsibilities of modern-day professionals" prohibit defense counsel from engaging in *ex parte* conferences with a plaintiff's treating physician. (*Petrillo*, 148 Ill. App. 3d at 610, 499 N.E.2d at 971.) The *Petrillo* court ruled that, although a plaintiff, by filing suit, implicitly consents to his physician releasing confidential medical information which relates to the mental or physical condition which he has placed in issue, this consent is only pursuant to court-authorized methods of discovery. (*Petrillo*, 148 Ill. App. 3d at 591, 499 N.E.2d at 959.) The court stated that simply filing suit does not terminate the physician-patient relationship such that the physician can now discuss his patient's confidences "in an *ex parte* conference with the patient's legal adversary." (*Petrillo*, 148 Ill. App. 3d at 591, 499 N.E.2d at 959.) The *Petrillo* court reasoned:

> "[C]onfidentiality and patient consent are inextricably tied together; the relationship between a patient and his physician remains confidential only as long as a patient can rest assured that he must give his consent before any of the information disclosed during the physician-patient relationship is released to third parties. Indeed, at the very minimum, the confidential relationship existing between a patient and physician demands that information confidential in nature remain, absent patient consent, undisclosed to third parties. If such were not the case, then no confidentiality between a patient and his physician in

fact exists." *Petrillo*, 148 Ill. App. 3d at 590, 499 N.E.2d at 958-59.

In *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 315, 532 N.E.2d 327, 328, the appellate court held that *Petrillo* applied where plaintiff was injured when she fell from a gurney allegedly as the result of the negligence of a nonphysician-employee of the hospital. The *Ritter* court affirmed the trial judge's ruling which barred defendant from calling plaintiff's treating physicians because they engaged in *ex parte* conferences with defense counsel. (*Ritter*, 177 Ill. App. 3d at 323, 532 N.E.2d at 333.) The court rejected defendant's argument that agency principles applicable to the relationship between a hospital and its employee-physicians could "abrogate" the physician-patient privilege. (*Ritter*, 177 Ill. App. 3d at 317, 532 N.E.2d at 329.) The *Ritter* court also determined that the defendant hospital could not be included within the physician-patient privilege where the case involved "only the alleged negligence of a nonphysician-employee of [the] hospital." (*Ritter*, 177 Ill. App. 3d at 317, 532 N.E.2d at 329.) The *Ritter* court did assert, however:

"[w]hen a patient seeks to hold a hospital vicariously liable for the negligence or malpractice of an employee-physician, exclusion of the hospital from the physician-patient privilege would, we believe, and as Rush argues, effectively prevent the hospital from defending itself by barring communication with the physician for whose conduct the hospital is allegedly liable. In contrast to such a case, Rush's exclusion from the physician-patient privilege in this case would not bar it from communicating with the employee allegedly responsible for plaintiff's injuries and thus would not bar it from defending itself from liability." *Ritter*, 177 Ill. App. 3d at 317-18, 532 N.E.2d at 329-30.

The reasoning in *Ritter* was subsequently adopted and applied by the second district in *Testin v. Dreyer Medical Clinic* (1992), 238 Ill. App. 3d 883, 605 N.E.2d 1070, *appeal granted* (1993), 149 Ill. 2d 661, 612 N.E.2d 524. In *Testin*, plaintiff sued Dreyer Medical Clinic (Dreyer) and several staff physicians in its obstetrics unit for medical malpractice after her bowel ruptured following gynecological surgery. After her surgery, plaintiff was treated by Dr. Herwick, another physician at Dreyer. Dr. Herwick was not named in the suit and was not alleged to be a negligent physician. Plaintiff's counsel subsequently gave Dreyer's counsel permission to speak with those physicians who had been named as defendants and for whose conduct Dreyer was allegedly vicariously liable. Defendants argued that, by allowing Drey-

er's counsel to speak with certain physicians in its obstetrics unit, plaintiff "waived" the physician-patient privilege and defendants could now speak *ex parte* with Dr. Herwick, plaintiff's subsequent treating physician. (*Testin*, 238 Ill. App. 3d at 888, 605 N.E.2d at 1073.) Plaintiff countered that she was merely following the reasoning of the *Ritter* court which, as she interpreted the decision, held that the physician-patient privilege "is waived as to those physicians for whom the medical corporation may be held vicariously liable." *Testin*, 238 Ill. App. 3d at 889, 605 N.E.2d at 1073.

The *Testin* court recognized that the *Ritter* case was not "on all fours" factually, but concluded that, since the *Ritter* defendant also was seeking to speak *ex parte* with plaintiff's treating physician who was also defendant's employee, *Ritter* was "analogous." (*Testin*, 238 Ill. App. 3d at 889, 605 N.E.2d at 1073.) In agreeing with plaintiff that she did not waive the physician-patient privilege, the *Testin* court stated:

> "[a]lthough the waiver rule that plaintiffs claim exists in *Ritter* is not evident, we find that the spirit of that rule is implied. The [*Ritter*] court implies that the physician-patient privilege does not apply when the medical entity wishes to communicate with the allegedly negligent physician through whom it may be vicariously liable; otherwise, the privilege applies." (*Testin*, 238 Ill. App. 3d at 889, 605 N.E.2d at 1073.)

The court found persuasive the argument that, if a hospital is being held vicariously liable for the negligence of a physician-employee, the physician-patient privilege "would effectively prevent the hospital from defending itself." (*Testin*, 238 Ill. App. 3d at 889, 605 N.E.2d at 1073.) The court reasoned that "[i]n a sense, the obstetrics unit was the specific defendant sued when Dreyer was sued because the care given by physicians in that department is the care in question." (*Testin*, 238 Ill. App. 3d at 890, 605 N.E.2d at 1073.) Therefore, the *Testin* court held that, since plaintiffs did not allege that Dr. Herwick was negligent, *Petrillo* precluded defendants from conducting *ex parte* conferences with him.

We agree with the reasoning of the *Ritter* and *Testin* decisions and hold that, if a plaintiff attempts to hold a hospital vicariously liable for the conduct of his own treating physician, the defendant hospital is included within the physician-patient privilege and the patient has impliedly consented to the release of his medical information to the defendant hospital's attorneys. Thus, in such a situation, *ex parte* conferences between defense counsel and plaintiff's treating physician are permissible. Although the express holding of the *Petrillo* case for-

bids *ex parte* conferences between defense counsel and plaintiff's treating physician, we do not believe that our decision here today is contrary to the *Petrillo* court's underlying reasoning.

In support of its argument that we should strictly apply the holding in *Petrillo*, plaintiff contends that the second division's recent decision in *Almgren v. Rush-Presbyterian-St. Luke's Medical Center* (1992), 240 Ill. App. 3d 585, 608 N.E.2d 92, *appeal granted* (1993), 149 Ill. 2d 647, 612 N.E.2d 510, decides this precise issue in plaintiff's favor. In *Almgren*, plaintiff sought to hold a hospital vicariously liable for the alleged negligence of a resident psychiatrist who treated plaintiff at the hospital. The *Almgren* court held that both the Mental Health and Developmental Disabilities Confidentiality Act (Act) (Ill. Rev. Stat. 1991, ch. 91½, par. 801 *et seq.* (now 740 ILCS 110/1 *et seq.* (West 1992))) and the *Petrillo* doctrine prohibited defense counsel from speaking to plaintiff's psychiatrist other than through formal court-authorized discovery. (*Almgren*, 240 Ill. App. 3d at 597-98, 608 N.E.2d at 100.) However, the court recognized that, unlike in *Petrillo*, a statute specifically governs the disclosure of the mental condition of those persons who seek psychiatric care. The *Almgren* court cited extensively from section 10 of the Act, which provides in pertinent part:

> " '(a) Except as provided herein, in any civil *** proceeding, or in any proceeding preliminary thereto, a recipient *** has the privilege *** to prevent the disclosure of the recipient's record or communications.
>
> * * *
>
> (3) In the event of *** an action filed by a recipient *** for injury caused in the course of providing services to such recipient, the therapist *** whose actions are alleged to have been the cause of injury may disclose pertinent records and communications to *** attorneys engaged to *** provide representation in connection with such matter ***, and may testify as to such records or communication in any *** discovery proceeding for the purpose of preparing and presenting a defense against such claim or action.' " *Almgren*, 240 Ill. App. 3d at 592-93, 608 N.E.2d at 96-97, quoting Ill. Rev. Stat. 1991, ch. 91½, par. 810 (now 740 ILCS 110/10 (West 1992)).

The decision in *Almgren* was primarily the result of the court's interpretation of the Act. The Act's strict confidentiality provisions, however, do not apply in this case because psychiatric testimony is not at issue. There is no statute which specifically governs here. To the extent that the *Almgren* court found that *Petrillo* prohibited a

defendant hospital from engaging in private conferences with its physician-employees for whose conduct it is alleged to be vicariously liable, we disagree.

*Petrillo* was a products liability case against a baby food manufacturer for injuries allegedly sustained after ingesting the company's baby formula. Plaintiffs' medical treatment was not alleged to be negligent or the basis of defendant's liability. The *Petrillo* court reasoned that the public rely upon the fact that their medical confidences will not be revealed to third parties unless they give their consent to disclosure. (*Petrillo*, 148 Ill. App. 3d at 592, 499 N.E.2d at 960.) The court determined that the sanctity of this confidential and fiduciary relationship between a physician and his patient is threatened when a treating physician speaks privately "with the patient's legal adversary." (*Petrillo*, 148 Ill. App. 3d at 591, 499 N.E.2d at 959.) Therefore, the court held that when a plaintiff places "a specific mental or physical condition at issue" by filing suit, defendant must follow court-authorized methods of discovery to obtain any relevant medical information from plaintiff's physician. (*Petrillo*, 148 Ill. App. 3d at 594-95, 499 N.E.2d at 961.) The *Petrillo* court, however, was not presented with, nor did it consider, the situation that we face here today. Here, it is not solely plaintiff's "mental or physical condition which is placed at issue," it is the conduct and actions taken by plaintiff's own physician during treatment which are alleged to be the basis of defendant's liability.

In this case, Dr. Hall was not speaking *to* plaintiff's legal adversary so much as he *was* plaintiff's legal adversary. Dr. Hall was the supervisor of orthopedic surgery at Cook County Hospital and responsible for all decisions regarding patient care. Plaintiff understood this fact and, at trial, repeatedly referred to Dr. Hall as "the head man." As a matter of fact, Dr. Hall was a named defendant up until the eve of trial and was only dismissed from the suit because plaintiff was unable to properly serve him with process. It was Dr. Hall's decisions regarding plaintiff's care and treatment during his 21-day stay at the hospital which were at issue and for which plaintiff was attempting to hold Cook County vicariously liable. We do not believe, in such a situation where the plaintiff's physician's alleged negligent treatment is purported to be the cause of plaintiff's injuries, that the confidentiality of any medical information the physician may have learned during his allegedly negligent treatment of plaintiff outweighs the defendant's right to effectively defend itself and to unfettered communication "with the physician for whose conduct the hospital is allegedly liable." (See *Ritter*, 177 Ill. App. 3d at 317-18, 532 N.E.2d at 330.) In

light of our disposition of this issue, we need not address defendants' remaining arguments.

For the foregoing reasons, the decision of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

MANNING, P.J., and CAMPBELL, J., concur.